ATTORNEYS FOR APPELLANT
Alison L. Benjamin
Paul G. Stracci
Merrillville, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

FILED
Jun 30 2010, 2:25 pm

CLERK
of the supreme court,
court of appeals and
tax court

In the

## Indiana Supreme Court

No. 45S03-0910-CR-430

LUIS E. DURAN,                                          *Appellant (Defendant Below),*

v.

STATE OF INDIANA,                                       *Appellee (Plaintiff Below).*

Interlocutory Appeal from the Lake Superior Court, No. 45G04-0708-FA-23
The Honorable Thomas P. Stefaniak, Jr., Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 45A03-0811-CR-569

**June 30, 2010**

**Boehm, Justice.**

Police attempting to execute an arrest warrant broke into the defendant's home where they did not find their suspect, but happened on evidence of an unrelated crime. The police acted solely on the basis of uncorroborated information from an anonymous source, and without any immediate need to prevent ongoing crime or flight. We hold that the entry into the defendant's home violated both the federal and state constitutions and the evidence must be suppressed.

**Facts and Procedural History**

On March 23, 2007, officers of the East Chicago Police Department attempted to execute an arrest warrant for Nelson Hernandez, an auto theft suspect. The arrest warrant listed 3902 Butternut as Hernandez's address. When Officer David Gemeinhart went to that address to serve the warrant, Hernandez's mother answered the door and told Gemeinhart that Hernandez was staying with her sister (Hernandez's aunt) in "the Harbor," a different area of East Chicago. Gemeinhart did not ask for the aunt's name or address.

That evening, Gemeinhart and Officer Kevin Harretos happened upon Officer Samuel Maldonado at the police station. Maldonado reported that a few days earlier he had dropped Hernandez off in front of an apartment building at 2001 Broadway, which might colloquially be identified as in "the Harbor."[1] Maldonado had driven Hernandez home from the hospital after Hernandez had been released in a full leg cast as a result of injuries sustained in an accident that ended a police chase. Maldonado did not explain why he gave Hernandez a ride, but he did say that when he brought Hernandez to the apartment building at 2001 Broadway, an older woman met Hernandez outside the building and helped move his belongings inside.

Sometime after midnight, Maldonado, Gemeinhart, Harretos, and at least two other officers decided to try to serve the warrant at 2001 Broadway. The building housed both apartments and a tavern. The outer door leading to the apartments was locked, and the officers had no information suggesting which apartment within the building might house Hernandez. At some point a man emerged from the building and the officers showed him a picture of Hernandez and asked him if he knew where Hernandez was. The officers provided inconsistent accounts of whether the man came from the apartments or the tavern, what he looked like, and how he answered their questions. According to Harretos, the man came out of the apartment entryway, had long hair, and was large (over six feet tall) and "scruffy looking," with a beard. Harretos also said that when the officers showed the man a picture of Hernandez, the man stated that he didn't know the man in the picture but he was staying in an upstairs apartment with a green door. According to Gemeinhart, the unidentified informant came from the door to the tavern, was in

---

[1] The record is silent on this point but we accept our colleague Justice Rucker's assurance at oral argument as to this point of Lake County geography.

2

his forties or fifties, had a mustache, and was 5'10" or 5'11" tall. Gemeinhart recalled that the man stated that he knew Hernandez and directed the officers to the apartment with the green door, but did not provide the officers with entry to the apartments. According to Maldonado, the unidentified informant came from the tavern and was "neat looking," in his fifties, and was 5'10" or 5'11" tall. Maldonado said the man opened the outer apartment door for the officers and directed them to the apartment with the green door. The officers all agreed that they did not get the man's name and did not know where he went after they spoke with him. They also all agreed that the man directed the officers to an upstairs apartment with a green door, and that there was only one apartment with a green door in the building.

The officers knocked on the green door to Luis Duran's apartment. The officers did not agree on how they announced their presence, whether they stated their purpose, what the occupant's response was, or how long they knocked on the door.[2] They all agreed, however, that after knocking for several minutes, and after hearing some noises inside the apartment, they broke down Duran's door, entered his apartment, and held him at gunpoint.

Hernandez was not in Duran's apartment, but the officers found a plastic bag containing a "white rock like subject" on the bedroom window sill and what appeared to be narcotics packaging equipment on the dresser. The white substance later tested positive for cocaine. After Duran was placed under arrest, the officers knocked on another door in the apartment building and immediately found and arrested Hernandez.

---

[2] According to Harretos, Gemeinhart knocked on the door and said "Open the door, we need to talk to you," and "We're looking for a Mr. Hernandez." Duran answered "Hold on," and then the officers continued knocking and heard moving around and then silence behind the door. Gemeinhart continued knocking for several minutes, eventually saying "If you don't open the door right now we're gonna kick it open." Then the officers kicked in Duran's door. Harretos estimated that the total time between first knock and their forced entry into Duran's apartment was about twelve minutes. Harretos did not indicate that Gemeinhart identified himself as a police officer when knocking on the door.

Gemeinhart's testimony was that he knocked on the door and Duran responded "Who is it?" Gemeinhart said "It's the police, open the door," and Duran responded "Hold on a minute." According to Gemeinhart, the officers then heard shuffling around in the apartment followed by silence. Gemeinhart continued knocking, eventually stating "It's the police department, open the door. If you don't open up the door I'm going to break in the door." Gemeinhart estimated that the total time between first knock and their forced entry into Duran's apartment was at most seven minutes.

According to Maldonado, Gemeinhart knocked on the door and said "Police, police." After knocking for several minutes, Duran responded "Who is it?" Gemeinhart announced again that it was the police. Duran replied, "Hold on a minute," Gemeinhart continued knocking, and then the officers kicked in the door. According to Gemeinhart, the total time between first knock and their forced entry into Duran's apartment was about 10 minutes.

3

The State charged Duran with Class A felony dealing in cocaine and Class C felony possession of cocaine. Duran moved to suppress the evidence found in his apartment, arguing that the officers' search of his apartment violated both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution. After a hearing in which Harretos, Gemeinhart, and Maldonado testified, the trial court denied Duran's motion, but certified its order for interlocutory appeal. The Court of Appeals accepted the appeal and affirmed the trial court's denial of the motion to suppress over the dissent of Judge Darden. Duran v. State, 909 N.E.2d 1101 (Ind. Ct. App. 2009). We granted transfer.

## Standard of Review

In reviewing a trial court's ruling on a motion to suppress, we determine whether substantial evidence of probative value exists to support the trial court's ruling. Litchfield v. State, 824 N.E.2d 356, 358 (Ind. 2005). We do not reweigh the evidence and consider conflicting evidence most favorably to the trial court's ruling. Id.

## I. Fourth Amendment Claim

Duran first argues that the officers' entry and search of his apartment violated his rights under the Fourth Amendment to the United States Constitution. The Fourth Amendment proclaims that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. This federal right to be free of unreasonable searches and seizures applies to the states through the Fourteenth Amendment. Krise v. State, 746 N.E.2d 957, 961 (Ind. 2001) (citing Mapp v. Ohio, 367 U.S. 643, 650 (1961)).

The first issue is the requisite quality of information to support entry into a home to execute an arrest warrant without a search warrant. "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511 (1961). In recognition of this principle, the police may not enter a home by force to make a "routine" arrest without a warrant. Payton v. New York, 445 U.S. 573, 576 (1980). An arrest warrant founded on probable cause gives the police "limited authority to enter a dwelling in which the

4

suspect lives when there is reason to believe the suspect is within." Id. at 603. The belief is judged on the information available to the officers at the time of entry and need not prove to have been correct in hindsight. United States v. Lovelock, 170 F.3d 339, 343 (2d Cir. 1999). As one leading treatise summarized, it is "generally accepted" that reason to believe "involves something less than" probable cause.[3] 3 Wayne R. LaFave, Search and Seizure § 6.1(a), at 265 (4th ed. 2004).

Because the "reasonable belief" required by Payton requires a lower degree of confirmation than probable cause, some commentators have likened "reasonable belief" to the "reasonable suspicion" necessary for an investigative "Terry stop." See Terry v. Ohio, 392 U.S.

_____

[3] Not all courts agree. The Ninth Circuit alone among federal circuits has expressly required probable cause rather than a reasonable belief as to the subject's residence and presence. Motley v. Parks, 432 F.3d 1072, 1080 (9th Cir. 2005); United States v. Gorman, 314 F.3d 1105, 1115 (9th Cir. 2002); see also Anderson v. State, 145 P.3d 617, 625 (Alaska Ct. App. 2006) (requiring probable cause on state law grounds); State v. Smith, 90 P.3d 221, 224–25 (Ariz. Ct. App. 2004) (equating the "reason to believe" standard with probable cause). The Seventh Circuit has not yet resolved this issue. Covington v. Smith, 259 F. App'x. 871, 874 (7th Cir. 2008) ("We have not previously chosen a standard and we need not do so here."). But see United States v. Gillespie, 650 F.2d 127, 128–29 (7th Cir. 1981) (suppressing evidence found at home of a third party when officers attempted to arrest fugitive there when officers had "good cause" to believe the fugitive was hiding there, officers held defendant at gunpoint while they searched his home, and there were no exigent circumstances).

Reasonable belief is usually based on information that comes from multiple sources and is verified in some way. For example, in United States v. Pruitt, 458 F.3d 477, 483 (6th Cir. 2006), an anonymous caller supplied Pruitt's address. Surveillance observed a man enter and exit the home, then speed away. When he was stopped for speeding, the man identified Pruitt by his street name and said he was inside the residence selling drugs. In United States v. Bervaldi, 226 F.3d 1256, 1263 (11th Cir. 2000), the officers had observed the subject at the residence and the subject had stated to police on a prior occasion that he resided there and not at his parents' address listed on the warrant. In Lovelock, 170 F.3d at 344, the address on the warrant was based on probation records, and residents of other apartments in the house stated that the subject stayed in the attic. In United States v. Route, 104 F.3d 59, 62–63 (5th Cir. 1997), when officers arrived at the address with arrest warrants for two suspects, they observed one of the suspects leaving the residence and arrested him immediately. They also had verified through "credit card applications, water and electricity bills, car registration, and receipt of mail" that the other suspect was residing at the address. When the first suspect left the home, the television was still on and another car remained in the driveway. Id. at 62. In United States v. Risse, 83 F.3d 212, 216–17 (8th Cir. 1996), the subject had stated to officers that she could be contacted at the residence, a confidential informant with a history of reliability had stated she lived there, and police had previously successfully contacted her there. In each of these cases the belief as to the suspect's residence and presence was found to be reasonable.

Compare Harasim v. Kuchar, 702 F. Supp. 178, 182 (N.D. Ill. 1988) (no reasonable belief where the officer's only information that the subject of an arrest warrant lived in a particular house came from unidentified neighbors who did not specifically name the subject of the warrant); United States v. Luckey, No. 09-CR-889, 2009 WL 4730198, Slip Op. at *6 (S.D.N.Y. Dec. 10, 2009) (subject's use of the building superintendent's unsecured wireless internet service, the apartment's proximity to the superintendent's apartment, and the building superintendent's identification of a photograph and subsequent direction to the apartment were insufficient); United States v. Hardin, 539 F.3d 404, 421 (6th Cir. 2008) (confidential informant's report that the suspect may be in an apartment the informant could describe but could not identify by number was not sufficient). "[A] common feature" of cases finding reasonable belief was "recent, eyewitness evidence connecting the suspect to the residence, and often even conduct by the suspect that demonstrates a tie to the residence." Hardin, 539 F.3d at 421.

1 (1968); James P. Fleissner, Constitutional Criminal Procedure: Annual Eleventh Circuit Survey, 47 Mercer L. Rev. 765, 779 (1996); Matthew A. Edwards, Posner's Pragmatism and Payton Home Arrests, 77 Wash. L. Rev. 299, 364–65 (2002). On the other hand, as a matter of language, more information is required to believe something is true than to suspect it. And, as a matter of policy, entry into a home to execute an arrest warrant without exigent circumstances based on "reasonable belief" may require "something more" than an investigative stop based on "reasonable suspicion." Immediate execution of a "routine" arrest warrant, i.e., one involving no exigent circumstances, is not ordinarily necessary to prevent future crime. A Terry stop, by contrast, is justified in part by concern that there is ongoing criminal activity. United States v. Cortez, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). As explained below, we conclude that the information available to the officers here did not satisfy even the least restrictive reasonable suspicion standard. We therefore need not further explore the potential differences in the quality of information available required to meet probable cause, reasonable belief, and reasonable suspicion. For purposes of this opinion, however, we will adopt the terminology of the majority of courts and use "reasonable belief" as the quality of information available required to enter a home to execute an arrest warrant.

The next issue is what the officers must reasonably believe. When the home that officers seek to enter is not that of the subject of the arrest warrant, officers must obtain a search warrant absent exigent circumstances. Steagald v. United States, 451 U.S. 204, 216 (1981). Most jurisdictions require that the police have a reasonable belief that the dwelling is the residence of the subject of the warrant and that the subject is present at the time the officers attempt to enter on authority of an arrest warrant. See, e.g., United States v. Bervaldi, 226 F.3d 1256, 1263 (11th Cir. 2000); Lovelock, 170 F.3d at 343; United States v. Risse, 83 F.3d 212, 216 (8th Cir. 1996); Harasim v. Kuchar, 702 F. Supp. 178, 182 (N.D. Ill. 1988).

It is well established that a reasonable belief that a suspect lives in an apartment building does not give the police the authority to enter every apartment in that building. Flaherty v. State, 443 N.E.2d 340, 343 (Ind. Ct. App. 1982); Thompson v. State, 198 Ind. 496, 497, 154 N.E. 278, 279 (1926). Residents and owners of units in condominium and apartment buildings enjoy the same Fourth Amendment protection as people who live in single-family homes. This is equally

true of large complexes and "very small" apartment buildings. The officers therefore required a reasonable belief that Hernandez resided behind the green door, not merely a reasonable belief that he resided somewhere in 2001 Broadway. In view of the hour and Hernandez's immobilized condition, if the officers' belief as to Hernandez's place of residence was reasonable, it was reasonable to believe he was inside. The issue therefore boils down to whether the police reasonably believed that the apartment with the green door was Hernandez's residence.

Duran argues that even under the more relaxed view of "reasonable belief," equating it to reasonable suspicion required for a Terry stop, the officers' entry into his apartment violated the Fourth Amendment. The officers had reason to believe that Hernandez was residing in the apartment building at 2001 Broadway based on Hernandez's mother's report that he was living with her sister in that general area, and Maldonado's having personally dropped Hernandez off with his possessions outside the building a few days earlier and seeing an older woman helping him into the building. Hernandez was on crutches and in a full leg cast, so it was reasonable to believe he had not relocated his residence in the few days since his ride home from the hospital.

Despite their reasonable belief as to Hernandez's residence in the building, the police here lacked even reasonable suspicion that his residence was behind the green door. An anonymous tip, standing alone, does not justify a Terry stop. Alabama v. White, 496 U.S. 325, 332 (1990); Kellems v. State, 842 N.E.2d 352, 356 (Ind. 2006). The officers had only statements of an unidentified man on the street who may or may not have had any connection to the apartment building. This anonymous informant did not enjoy the credibility that is afforded to one who is identified and is thereby exposed to potential civil or even criminal consequences for false information. Illinois v. Gates, 462 U.S. 213, 233–34 (1983). In Pawloski v. State, 269 Ind. 350, 354, 380 N.E.2d 1230, 1232 (1978), we noted that when a citizen volunteers information to the police, there may be more reason to believe that the information is reliable because informants who come forward voluntarily are ordinarily motivated by good citizenship or a genuine effort to aid law enforcement officers in solving a crime. Id. But the informant here was a person who responded to police questions, not a "cooperative citizen" who volunteered information. Moreover, even information volunteered by a citizen requires some corroboration. Id. at 355, 380 N.E.2d at 1233. In Trimble v. State, 842 N.E.2d 798, 803–804 (Ind. 2006), we noted that corroboration of a concerned citizen's tip requires consideration of factors such as

7

"whether the citizen has personally witnessed the reported crime," "whether the police subsequently corroborate details of the citizen's report," "whether the citizen has identified herself and thereby subjected herself to civil liability or prosecution for false reporting," and "the absence of circumstances casting the citizen's reliability into question." None of these bolstered the officers' belief that Hernandez resided in Duran's apartment. As a result, their entry into the apartment was not authorized by the arrest warrant and violated the Fourth Amendment.

## II. Article I, Section 11 Claim

Duran also argues that the search of his apartment violated Article I, Section 11, of the Indiana Constitution. This section is identical in text to the Fourth Amendment but Indiana has developed a distinct approach to search and seizure. "Instead of focusing on the defendant's reasonable expectation of privacy, we focus on the actions of the police officer," and employ a totality-of-the-circumstances test to evaluate the reasonableness of the officer's actions. Trimble, 842 N.E.2d at 803. Reasonableness is assessed by balancing: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." Litchfield v. State, 824 N.E.2d 356, 361 (Ind. 2005).

The State argues that "degree of suspicion" relates to the degree of the officers' suspicion that Hernandez had committed the crime of auto theft. We do not agree. Litchfield dealt with a search and seizure in the course of investigating a crime, not executing an arrest warrant. The issue in both cases is the reasonableness of the officers' assumptions, suspicions, or beliefs based on the information available to them at the time. But the subject of those assumptions, suspicions, or beliefs is not the same. In executing an arrest warrant, the Indiana Constitution, like the Fourth Amendment, focuses on the reasonable belief as to the residence and presence of the subject, not whether a crime was committed. Similarly, the reasonableness of an entry into a home to execute an arrest warrant requires a reasonable belief that there is a valid warrant, a reasonable belief that the residence is that of the suspect, and a reasonable belief that the suspect will be found in the home. Without each of these, and without any claim of exigent circumstances, the sanctity of the home demands review by a judicial officer before entry may be forced. The police clearly had a high degree of suspicion that Hernandez had committed the

crime, but for the reasons explained in addressing the Fourth Amendment claim, they had an insufficient basis to conclude he was residing in the apartment with the green door.

The degree of intrusion is evaluated from Duran's point of view.[4] Litchfield, 824 N.E.2d at 360. Searches of trash put out for collection, for example, have sometimes been found to be reasonable due in part to their minimal intrusion into areas in which citizens have a reduced expectation of privacy. See, e.g., Moran, 644 N.E.2d at 541. But Duran had no reduced expectation of privacy in his apartment in the middle of the night. Here the police intrusion—a forced entry into Duran's apartment complete with drawn weapons and a shattered door—was of the highest order. The State concedes this but argues that the high degree of intrusion is of less significance because Duran would have been just as reluctant to open his door if the police had announced that they had a search warrant or had more reliable albeit incorrect information that Hernandez resided in the apartment.

The contention that the police would have ended up breaking down Duran's door anyway does not respond to the gravity of the intrusion. Rather it amounts to a claim of no harm, no foul. We have already noted that the information the officers had did not give rise to a reasonable suspicion that Hernandez resided behind the green door. A fortiori it would not have supported a search warrant. Courts long have rejected the claim that unlawful searches may be justified on the ground that a warrant would have been available to support the officers' action. Johnson v. United States, 333 U.S. 10, 14 (1948) ("Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the [Fourth] Amendment to a nullity and leave the people's homes secure only in the discretion of police officers."). The same reasoning applies to a claim that if the officers had reliable information, Duran's response and the resulting intrusion would be the same. Moreover, if the police had verified Hernandez's aunt's residence, they would not have knocked on Duran's door. But the fundamental point is that the degree of intrusion is viewed from the point of view of the occupants or owners of the

_____

[4] The degree of intrusion factor would usually also include an analysis of whether the defendant consented to the search. However, here, even though the three officers testified that Duran told them they could look around in his apartment for Hernandez, the State does not argue that Duran consented to the search. Because we do not think it is possible that Duran's consent was voluntary when at least five armed police officers forced their way into his apartment and held him at gunpoint, we decline to address this issue.

premises searched. All citizens have a very strong interest in protecting the sanctity of the home from unannounced midnight invasions. The degree of intrusion is not reduced by the possibility that the police might have ended up breaking down Duran's door even if they had more reliable information or had obtained a warrant.

In Litchfield, we noted that "the degree of intrusion may render a search unreasonable, even where law enforcement needs are obviously present." Litchfield, 824 N.E.2d at 360. Executing an arrest warrant is of course an important function of law enforcement. But the law enforcement needs in this case did not come close to countering the extreme intrusion of battering down a residence door in the middle of the night based on less than reliable information. In mandating that the police obtain a search warrant before searching the home of a third party for the subject of an arrest warrant, the Steagald Court concluded that the "exigent circumstances doctrine is adequate to accommodate legitimate law enforcement needs." 451 U.S. at 221–22. We agree, and the State has not claimed that there were exigent circumstances in this case. The law enforcement needs were not pressing. Hernandez was not a flight risk and nothing prevented the officers from verifying Hernandez's aunt's address or embargoing the apartment until either someone emerged or a search warrant could be obtained.

We have determined that the police did not have a reasonable basis for their suspicion that Hernandez was in Duran's apartment, and thus the degree of suspicion was not high. At the same time, the degree of intrusion into Duran's personal space was very high, and the degree of law enforcement needs was low. As such, the officers' selection of and subsequent forceful entry into Duran's apartment was unreasonable and violated Article I, Section 11 of the Indiana Constitution.

**Conclusion**

For the reasons set forth in this opinion, the trial court's denial of Duran's motion to suppress is reversed.

Dickson, Sullivan, and Rucker, JJ., concur.

Shepard, C.J., concurs in result with separate opinion.

10

**Shepard, Chief Justice, concurring in result**.

My colleagues seem to agree that when the police are told that a suspect has recently moved from his former residence and when the police actually helped him move there, that such information suffices to indicate that the place to which the police moved him and his belongings is the location at which he may be found. Possessing a newly-issued warrant, the police went back to the very small apartment building where the suspect was living. A man whom they encountered out front looked at a photograph of the person for whom the warrant was issued, confirmed that he recognized him, and said he lived upstairs in the apartment with the green door (it turned out that he lived down the hall).

I would say that this is a sufficient basis for a belief that Duran was in the apartment where they attempted to arrest him. I join in reversing because it was not a reasonable basis for doing so in the middle of the night to arrest a relatively immobile suspect.