# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**DEBORAH MARKISOHN**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW FALK**
Deputy Attorney General
Indianapolis, Indiana



FILED
Aug 29 2014, 9:33 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

C.H.,                                     )
                                          )
    Appellant-Defendant,          )
                                          )
      vs.                       )          No.  49A02-1310-JV-904
                                          )
STATE OF INDIANA,                         )
                                          )
    Appellee-Plaintiff.           )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Geoffrey Gaither, Magistrate
Cause No. 49D09-1306-JD-1818

**August 29, 2014**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

STATEMENT OF THE CASE

C.H. appeals his two adjudications as a delinquent child for having committed acts that, if committed by an adult, would constitute criminal trespass as a Class A misdemeanor,[1] and unlawful entry of a motor vehicle as a Class B misdemeanor.[2] First, C.H. argues that the juvenile court should have excluded an officer's identification testimony from evidence pursuant to the fruit of the poisonous tree doctrine of the exclusionary rule. Additionally, C.H. argues that his two adjudications violated the actual evidence test of Indiana's Double Jeopardy Clause. Lastly, C.H. appeals the juvenile court's dispositional order requiring him to pay restitution.

First, because the officer had reasonable suspicion and his actions were reasonable under the totality of the circumstances, we conclude that C.H.'s federal and state constitutional rights were not violated and that the identification testimony was properly admitted into evidence. In regard to C.H.'s double jeopardy claim, we conclude there is a reasonable possibility that the State used the same evidence to support both adjudications, and we remand to the juvenile court to vacate C.H.'s adjudication with the less severe penal consequence. Lastly, because C.H. did not object to any aspect of restitution and invited any error that may have occurred with the restitution order, we will not review his restitution challenge.

We affirm in part, reverse in part, and remand.

---

[1] IND. CODE § 35-43-2-2.

[2] I.C. § 35-43-4-2.7.

2

1. Whether the juvenile court abused its discretion by admitting an officer's identification testimony into evidence.

2. Whether C.H.'s adjudications for criminal trespass and unlawful entry of a motor vehicle violate Indiana's Double Jeopardy Clause.

3. Whether the juvenile court abused its discretion by ordering C.H. to pay restitution.

FACTS

On June 20, 2013, Felipa Xique-Juarez ("Felipa") was working from 3 p.m. to 9 p.m. That day, Felipa lost the keys to her white 1995 Honda Accord, and she did not give anyone else permission to drive her car. When Felipa finished work that evening, her car was gone, and she called the police to report that it had been stolen.

On June 21, 2013, Officer Havis Harris ("Officer Harris") was on duty working the third shift and patrolling for the stolen white Honda. Around midnight, Officer Harris observed a white Honda that matched the description of the stolen vehicle. After Officer Harris began to follow the white Honda, the vehicle turned into a Marathon gas station located on 4200 North Franklin Road. When Officer Harris began approaching the rear of the white Honda, she observed "three (3) to four (4) subjects bail[ ] out of the vehicle." (Tr. 9). Additionally, Officer Harris observed the white Honda's driver walk to the rear of the building and saw the passengers run away from the gas station "initially north then east behind a yard." (Tr. 9). Next, Officer Harris notified dispatch that she "had three (3) to four (4) black males take off running[,]" and she informed dispatch of the suspects' direction of travel. (Tr. 9). Following Officer Harris' communication with dispatch, she

3

examined the white Honda and "ran the VIN which came back as a stolen vehicle." (Tr. 10).

Officer James Blythe ("Officer Blythe"), who was on patrol in a marked squad car "very close to the area[,]" heard Officer Harris' call regarding "three (3) subjects run[ing] from a vehicle from the 42nd Street/Franklin [R]oad area[.]" (Tr. 38). Officer Blythe then "went to the first street east of that area which [was] Arbor Crest and tried to set up a perimeter." (Tr. 38). "[W]ithin five (5) minutes" of Officer Harris' radio call, (Tr. 45), Officer Blythe, who was parked in a driveway, "saw two (2) subjects walk behind [his] vehicle and[,] . . . they was [sic] watching [him] watching them." (Tr. 39). The two males matched the general description and direction of travel given by Officer Harris. Officer Blythe then "pulled out of the driveway and stopped them." (Tr. 39). One of these individuals was fourteen-year-old C.H.

After Officer Blythe stopped C.H. and the other individual, Officer Blythe took their names and dates of birth and ran their information through the Juvenile Center "to see if they had anything outstanding[.]" (Tr. 43). Officer Blythe then "waited for Officer Harris to come to the scene so she could identify" the two individuals as the suspects who "had ran [sic] from her, from the vehicle." (Tr. 44).

Officer Harris then "went to Sergeant Blythe's location, which was "maybe a block over[.]" (Tr. 10). Officer Harris "[o]bserved the subjects . . . asked . . . why they were out so late, how old they were." (Tr. 17.) Officer Harris then went back to the Marathon gas station to view its surveillance video.

When Officer Harris watched Marathon's video footage, she saw four black males, three of whom ran from the vehicle and the driver who walked away. She also saw that "two (2) of the gentlemen that was [sic] in the video matched the description of the two (2) that Sergeant Blythe had stopped just a street over." (Tr. 20). Specifically, she saw that one of the suspects was "wearing a black and white striped shirt with black shorts" and the "other was wearing a black zip up jacket[.]" (Tr. 20).

While driving back to Officer Blythe's location, Officer Harris radioed ahead to tell him that "the video footage matched the description of the two (2) gentlemen there on the scene." (Tr. 31). When Officer Harris arrived at the scene, she arrested C.H. and the other individual.

On June 28, 2013, the State filed a petition alleging that C.H. was a delinquent child for committing the following offenses that would be crimes if committed by an adult: Count 1, criminal trespass as a Class A misdemeanor; and Count 2, unlawful entry of motor vehicle as a Class B misdemeanor. At the time of these alleged offenses, C.H. had been on probation for one month for adjudications of Class A misdemeanor criminal trespass and Class C misdemeanor operating a vehicle without a license ("May 2013 Adjudications").[3]

On September 11, 2013, the juvenile court held a denial hearing. During Officer Harris' direct examination, C.H objected to the officer's identification testimony. Additionally, C.H. argued that Officer Blythe violated his rights under the Fourth

_____

[3] As part of C.H.'s probation from these May 2013 Adjudications, the juvenile court imposed a 7 p.m. curfew on C.H. and ordered him, among other things, to complete a restitution work program and to pay the victim, Mary Coleman, restitution of $500.

5

Amendment of the United States Constitution and Article One, Section Eleven of the Indiana Constitution by stopping him and that, as a result, the juvenile court should have excluded Officer Harris' identification testimony from evidence as fruit of the poisonous tree. Furthermore, during closing arguments, C.H. argued that the State's charges against him violated the actual evidence test of Indiana's Double Jeopardy Clause. The juvenile court entered a true finding on both allegations without acknowledging C.H.'s double jeopardy claim.

On October 4, 2013, the juvenile court held a disposition hearing. The probation department prepared a pre-dispositional report ("PDR") in preparation for the hearing. The PDR indicated that C.H. had not started his restitution work program from his prior probation order entered as part of his May 2013 Adjudications. In the PDR, the probation department recommended, in regard to this case, that C.H. be placed on a suspended commitment, pay restitution to Felipa, not have any contact with Felipa, and adhere to a parent-monitored 9 p.m. curfew. Additionally, the probation department recommended that C.H. be ordered to complete all prior probation orders, including paying Mary Coleman $500 restitution. During the disposition hearing, the State echoed the recommendations of the probation department and specified that the requested amount of restitution to Felipa was $500 "through the Restitution Work program." (Tr. 55).[4]

---

[4] The State informed the juvenile court that it had gotten "information" from Felipa that her damages to her car were approximately $2,000.00 but that she "underst[oo]d that we've got a limit here in Juvenile Court." (Tr. 55). The State further stated that Felipa was only requesting $500.00 through the work release program and that she did "not want to proceed civilly for the rest of it." (Tr. 55).

6

In response, C.H.'s attorney stated, "Your Honor, I've reviewed the orders made, the, the requested orders from Probation. My client is in agreement with all of them with two . . . exceptions." (Tr. 55-56). C.H.'s attorney then challenged the recommendations for a suspended commitment and curfew. C.H. did not make any challenges to the recommendation to pay restitution or to the specific amount sought.

The juvenile court placed C.H. on a suspended commitment and, as conditions of probation, ordered C.H. to: not have any contact with Felipa; pay restitution of $500 to Felipa; participate in a Restitution Work program; and adhere to a 9:00 p.m. curfew. The juvenile court also ordered C.H. to complete all prior court orders from his May 2013 Adjudications, including paying Mary Coleman $500 restitution. C.H. now appeals. We will provide additional facts as necessary.

## DECISION

### 1. Admission of Evidence

C.H. argues that the juvenile court abused its discretion by admitting Officer Harris' identification testimony into evidence. Specifically, C.H. contends that the police violated his rights under the Fourth Amendment of the United States Constitution[5] and Article 1, Section 11 of the Indiana Constitution[6] when the police conducted a *Terry* stop

---

[5] The Fourth Amendment to the United States Constitution provides, in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

[6] Article 1, Section 11 of the Indiana Constitution provides, in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated . . . ."

7

and that, as a result, the juvenile court should have excluded Officer Harris' testimony from evidence as fruit of the poisonous tree.

The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Conley v. State*, 972 N.E.2d 864, 871 (Ind. 2012), *reh'g denied*. We afford these decisions great deference on appeal, reversing only when a manifest abuse of discretion denies the defendant a fair trial. *Price v. State*, 765 N.E.2d 1245, 1248 (Ind. 2002).

A. *Fourth Amendment*

C.H. contends that the police lacked reasonable suspicion to initiate an investigatory stop and that by stopping him the police violated his rights under the Fourth Amendment.

The Fourth Amendment prohibits unreasonable searches and seizures by the government, and its safeguards extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *L.W. v. State*, 926 N.E.2d 52, 54 (Ind. Ct. App. 2010), *reh'g denied*. "However, a police officer may briefly detain a person for investigatory purposes without a warrant or probable cause if, based upon specific and articulable facts together with rational inferences from those facts, the official intrusion is reasonably warranted and the officer has a reasonable suspicion that criminal activity 'may be afoot.'" *Moultry v. State*, 808 N.E.2d 168, 170-171 (Ind. Ct. App. 2004) (quoting *Terry*

*v. Ohio*, 392 U.S. 1, 21-22 (1968)). Reasonable suspicion must be more substantial than an officer's unparticularized suspicion or hunch. *Croom v. State*, 996 N.E.2d 436, 440 (Ind. Ct. App. 2013), *reh'g denied*, *trans. denied*. In determining whether reasonable suspicion exists, we must examine "the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting wrong doing." *Id*. (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

The crux of C.H.'s argument is that Officer Blythe's stop of him was unconstitutional because the officer did not receive a description of the clothing that C.H. was wearing. While Officer Harris may not have given a description of C.H.'s clothing, a review of the totality of the circumstances demonstrates that Officer Blythe had reasonable suspicion to stop C.H. Specifically, the police were on patrol and were aware a report of a recently stolen white Honda. Shortly after midnight, Officer Harris saw a white Honda that matched the description and then followed it into a gas station, where the four black male occupants immediately exited the car. Upon seeing three of the four black male occupants run east, Officer Harris radioed dispatch to alert other patrolling officers of the fleeing suspects and included a description of the suspects' race, gender, and direction of travel. Thereafter, Officer Blythe, who was about a block away from the gas station and driving a marked police car, immediately set up a perimeter in the suspect's direction of travel. Less than five minutes from receiving the dispatch, Officer Blythe saw two black males walking behind his vehicle, and he saw that "they was [sic] watching [him] watching them." (Tr. 39). Additionally, Officer's Blythe's testimony reveals that the area where he stopped C.H. had sparse activity at that time of night, as he

9

saw only "a couple of other people walking" in that area. (Tr. 45). However, Officer Blythe did not stop these people (a male and female) because they did not match the dispatched description of the fleeing suspects. Thus, the totality of the circumstances reveal that Officer Blythe's stop of C.H. was not random and was instead based on a reasonable suspicion that criminal activity was afoot. Accordingly, we conclude that Officer Blythe did not violate C.H.'s Fourth Amendment rights.

B.        *Article 1, Section 11*

C.H. contends that the investigatory stop also violated his rights under Article 1, Section 11 of the Indiana Constitution. Although the Fourth Amendment and Article 1, Section 11 are worded identically, our Indiana constitutional standard "has evolved differently from the Fourth Amendment analysis[.]" *Smith v. State*, 744 N.E.2d 437, 440 (Ind. 2001). Under Article 1, Section 11, "'we focus on the actions of the police officer[]' and employ a totality-of-the-circumstances test to evaluate the reasonableness of the officer's actions." *Duran v. State*, 930 N.E.2d 10, 17 (Ind. 2010) (quoting *Trimble v. State*, 842 N.E.2d 798, 803 (Ind. 2006), *adhered to on reh'g*, 848 N.E.2d 278 (Ind. 2006)). In doing so, we balance three factors: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005). "It is the State's burden to show that intrusion into 'those areas of life that Hoosiers regard as private' was reasonable under the totality of the circumstances." *Austin v. State*, 997 N.E.2d 1027, 1034 (Ind. 2013) (quoting *State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006)).

10

Balancing the three *Litchfield* factors, we conclude that Officer Blythe's actions were reasonable under a totality of the circumstances. First, there was a high degree of concern that a violation had occurred. While on patrol around midnight, Officer Harris saw a white Honda that matched the description of Felipa's recently reported stolen vehicle. When Officer Harris followed the car, the four black male occupants jumped out of the car and fled the scene. Upon receiving Officer Harris' description of the fleeing suspects' race, gender, and direction of travel, Officer Blythe, who was about one block away, immediately set up a perimeter in that direction. Less than five minutes later, Officer Blythe stopped C.H. and another individual who fit the description given and who were acting somewhat suspiciously upon seeing the officer.

Additionally, the degree of intrusion was minimal. "[I]n examining the degree of intrusion, we consider the nature of the privacy interest upon which the search intrudes and the character of the intrusion itself." *Chest v. State*, 922 N.E.2d 621, 624 (Ind. Ct. App. 2009) (citing *Litchfield*, 824 N.E.2d at 361). Here, Officer Blythe stopped C.H. on a public street late at night where few people were present and asked for C.H.'s identification information. Moreover, Officer Blythe did not search C.H. and merely briefly detained C.H. and the other individual "due to the fact that they, [were] conducting an investigation of the possible two (2) subjects." (Tr. 40). Thus, the degree of intrusion was minimal. *See, e.g.*, *Myers v. State*, 839 N.E.2d 1146, 1154 (Ind. 2005) (concluding that the intrusion on the defendant, "at least as to public notice and embarrassment, was somewhat lessened because of the hour and place of the search").

11

Finally, the extent of law enforcement needs was high where, as discussed above, the stop occurred in the context of investigating fleeing suspects from a stolen vehicle. *See McDermott v. State*, 877 N.E.2d 467, 473 (Ind. Ct. App. 2007) (explaining that "'[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time'") (quoting *Russell v. State*, 519 N.E.2d 549, 551 (Ind. 1988)), *trans. denied.*

Based on our balancing of the above factors and the specific facts of this case, we conclude that Officer Blythe acted reasonably to investigate C.H.'s involvement in the stolen vehicle and that his actions in stopping C.H. did not violate C.H.'s state constitutional rights. Because Officer Blythe's stop of C.H. was not unconstitutional, the juvenile court properly admitted Officer Harris' identification testimony into evidence.

2. Double Jeopardy

C.H. argues that the juvenile court violated Indiana's Double Jeopardy Clause by entering true findings for Class A misdemeanor criminal trespass and Class B misdemeanor unlawful entry of motor vehicle. Specifically, C.H. argues that the State violated the Double Jeopardy Clause under the actual evidence test because the State used the same evidence to substantiate both true findings. The State contends that C.H.'s "adjudications for criminal trespass and unlawful entry of a motor vehicle were established by separate and distinct facts[.]" (State's Br. 13).

Our Indiana Supreme Court established the following test for deciding a double jeopardy claim:

[T]wo or more offenses are the same offense in violation of Article I, Section 14 of the Indiana Constitution if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense.

*Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999) (emphasis in original). "'[U]nder the *Richardson* actual evidence test, the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense." *Guyton v. State*, 771 N.E.2d 1141, 1142 (Ind. 2002) (quoting *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002)). For a successful double jeopardy claim under the *Richardson* actual evidence test, "a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." *Richardson*, 717 N.E. at 53. On appeal, in determining the facts used by the fact-finder, it is appropriate for a reviewing court to examine the evidence presented, the charging information, arguments of counsel, and any other factors that may have guided the fact-finder in making a decision. *See Goldsberry v. State*, 821 N.E.2d 447, 459 (Ind. Ct. App. 2005).

C.H. argues that the State violated the actual evidence test of Indiana's Double Jeopardy Clause. Specifically, C.H. contends that the manner in which the State charged and argued the case created a reasonably possibility that the juvenile court used the same evidence to establish the essential elements of both offenses. We agree.

13

At the denial hearing, the State presented evidence that C.H. had entered Felipa's car without her permission. In regard to the State's allegation that C.H. had committed criminal trespass, it alleged that he "knowingly or intentionally interfere[d] with the possession or use of the property of Felipa . . . , by having entered and travelled in [Felipa's] vehicle without [Felipa's] permission." (App. 16). For the unlawful entry of a motor vehicle allegation, the State alleged that C.H. "knowingly or intentionally enter[ed] a motor vehicle knowing that [he] [did] not have the permission of an owner Felipa . . . , and [did] not have a contractual interest in the motor vehicle." (App. 16). Thus, the State based both of the juvenile allegations on C.H.'s action of entering Felipa's car without her permission. The State then made the following closing argument:

> Your Honor, the State has proven beyond a reasonable doubt, doubt both counts 1 and 2 . . . . As to criminal trespass, you heard from Felipa . . . herself today that she did not give permission for anyone to drive her vehicle and that that [C.H.] did knowingly or intentionally interfere with the possession or use of her property by being in her car and traveling in her car. You heard from Officer Harris that she saw [C.H.] as well as a few of his friends leave the vehicle in front of the Marathon gas station and run, not having contractual interest in that property. As to count 2, the class B misdemeanor the unlawful entry of a motor vehicle, you heard again that the victim in this case owned a 1995 Honda Accord, not giving anybody permission or the keys to this vehicle on June 21st and the child did knowingly or intentionally enter that vehicle that did not belong to the driver or any of the people that were in the car with him.

(Tr. 51-52). In C.H.'s closing argument, his counsel specifically "argue[d] that the actual evidence test appli[ed,] which would mean that he could only be found true for one and not both, double jeopardy . . . ." (Tr. 53). The juvenile court entered true findings for both offenses, but it did not distinguish between the evidence it used to support the two adjudications.

14

Based on the allegations, the evidence presented at trial, and the State's failure to delineate separate facts that established both offenses, we hold that C.H. demonstrated that there is a reasonable possibility that the same evidentiary facts were used to establish the essential elements of both offenses.

Where two convictions—or in this case, adjudications—are determined to have violated double jeopardy principles and where neither conviction/adjudication can be reduced to a "less serious form of the same offense" to eliminate the violation, then the conviction/adjudication "with the less severe penal consequences" must be vacated. *Richardson*, 717 N.E.2d at 54-55. Therefore, we reverse and remand to the juvenile court with instructions to vacate the Class B misdemeanor unlawful entry of motor vehicle adjudication.

3. Restitution

C.H. argues that the juvenile court's restitution order should be vacated primarily because of the following reasons: (1) the State did not present evidence to support the amount of restitution ordered; (2) the State did not inquire into C.H.'s ability to pay; (3) the juvenile court did not consider whether restitution should be apportioned between C.H. and other respondents; and (4) the juvenile court did not specifically advise C.H. that he would be required to pay $500.00 restitution to Mary Coleman.[7] C.H. acknowledges that he did not raise these issues above at his denial hearing; however, he contends that the juvenile court committed a fundamental error.

---

[7] Mary Coleman was the victim to whom the juvenile court had previously ordered C.H. to pay restitution as a condition of probation in his May 2013 Adjudications.

15

The State responds that the juvenile court's order should be upheld because C.H.: (1) "waived all claims with regard to restitution due to his failure to object to any aspect of the juvenile court's order regarding restitution[;]" and (2) invited any error by affirmatively agreeing to all of the terms to which he now objects. (State's Br. 16).

In his reply brief, C.H. relinquishes his fundamental error argument and contends that "even if this Court finds that C.H. invited the error he now challenges, this Court may still address the merits of the restitution order under the public interest exception." (C.H.'s Reply Br. at 6).[8]

"The purpose behind an order of restitution is to impress upon the criminal defendant the magnitude of the loss he has caused and to defray costs to the victim caused by the offense." *Carswell v. State*, 721 N.E.2d 1255, 1259 (Ind. Ct. App. 1999). Pursuant to INDIANA CODE § 31-37-19-5(b)(4), a juvenile court may order a child to "pay restitution if the victim provides reasonable evidence of the victim's loss, which the child may challenge at the dispositional hearing." The restitution order is within the court's discretion, and this Court will reverse only upon a showing of an abuse of discretion. *P.J. v. State*, 955 N.E.2d 234, 235 (Ind. Ct. App. 2011). An abuse of discretion occurs when the trial court's determination is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id*.

---

[8] The public interest exception is an exception to the doctrine of mootness, not invited error. *See Matter of Lawrence*, 579 N.E.2d 32, 37 (Ind. 1991). Thus, we decline C.H.'s request to review this case under this exception.

16

"Generally, failure to object to an award of restitution constitutes waiver of a challenge to the award on appeal, unless a defendant argues that the award was fundamentally erroneous and in excess of statutory authority." *Morris v. State*, 2 N.E.3d 7, 9 (Ind. Ct. App. 2013). "[A] defendant's failure to make a specific and timely objection to the trial court's receipt of evidence concerning the amount of restitution constitutes waiver of the issue on appeal." *Id.* Nevertheless, a number of cases have emphasized this Court's preference for reviewing a trial court's restitution order even absent an objection by the defendant. *See e.g., Rich v. State*, 890 N.E.2d 44, 48-49 (Ind. Ct. App. 2013) ("the vast weight of the recent caselaw . . . indicates that the appellate courts will review a trial court's restitution order even where the defendant did not object based on the rationale that a restitution order is part of the sentence, and it is [our] duty . . . to bring illegal sentences into compliance") (internal quotation marks and citations omitted), *trans. denied*.

Here, however, C.H. not only failed to object to restitution, but he affirmatively agreed to the imposition of restitution. We addressed a similar argument in *Mitchell v. State*, 730 N.E.2d 197, 201 (Ind. Ct. App. 2000), *trans. denied*. In *Mitchell*, the trial court convicted Mitchell of rape and criminal deviate conduct. *Mitchell*, 730 N.E.2d at 201. At trial, Mitchell did not object to the issued restitution order and agreed to pay for the victim's counseling via restitution. *Id.* On appeal, we held that Mitchell had waived appellate review by both not objecting to the restitution order at trial and by agreeing to pay restitution, thus inviting error. *Id.*

17

Similar to the defendant in *Mitchell*, here, C.H. did not object to the juvenile court ordering him to pay restitution and, in fact, affirmatively agreed to pay the requested restitution. Specifically, after the State asked the juvenile court to follow the probation department's recommendations and requested that C.H. pay $500.00 in restitution to Felipa through the restitution work program, C.H.'s attorney stated that he had reviewed the probation department's recommendations and that C.H. was "in agreement with all of them" except for the suspended commitment and curfew recommendations. (Tr. 55-56).

Here, C.H waived error by not objecting to the restitution order and invited error by affirmatively agreeing to the terms which he now argues were erroneous. Because C.H. invited error, and invited error is not reversible error, we concluded that C.H. has waived review of this claim of error. *See, e.g.*, *Mitchell*, 730 N.E.2d at 201; *see also Kelnhofer v. State*, 857 N.E.2d 1022 (Ind. Ct. App. 2006) (holding that a defendant "cannot invite error and then request relief on appeal based upon that ground"). *But see Bennett v. State*, 862 N.E.2d 1281, 1288 (Ind. Ct. App. 2007) (declining to follow *Mitchell* and the application of waiver of restitution argument based on invited error because the *Bennett* Court was unsure if fundamental error was argued in *Mitchell* and because Bennett's restitution order contained no set amount, required payment of future expenses, was open-ended, and violated statutory authority).

Affirmed in part, reversed in part, and remanded.

FRIEDLANDER, J., and MATHIAS, J., concur.