## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 12 2018, 9:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew D. Anglemeyer
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John Means, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | July 12, 2018 <br><br> Court of Appeals Case No. <br> 49A04-1711-CR-2701 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Peggy Ryan Hart, Magistrate <br><br> Trial Court Cause No. <br> 49G05-1702-F4-5409 |

**Baker, Judge.**

[1] John Means appeals his conviction for Level 4 Felony Unlawful Possession of a Firearm by a Serious Violent Felon.[1]  Means argues that the trial court erroneously admitted evidence stemming from the execution of an arrest warrant that he maintains violated his federal and state constitutional rights. Finding no error, we affirm.

## Facts

[2] On February 6, 2017, Marion County Sheriff's Deputy Ernest Waterman, Deputy Ryan Tunny, and Lieutenant Lewis Perrine went to 539 North Gray Street in Indianapolis to serve an arrest warrant on Terry Edwards.  The address was provided in a warrant packet created by analysts from the intelligence unit of the Sheriff's Office.

[3] Deputy Waterman and Lieutenant Perrine went to the front door, while Deputy Tunny went behind the house.  Deputy Waterman knocked on the front door, announced that he was an officer, stated that he had a warrant, and said that someone should open the door.  At that point, Deputy Waterman "heard a bunch of what sounded like people running inside, jumping around."  Tr. Vol. II p. 13.  After the knock, Deputy Tunny heard "the sound of something being put up against the side door" as a barricade and heard someone inside the

---

[1] Ind. Code § 35-47-4-5(c).

house say, "F*ck, the cops are here." *Id.* at 168, 178. Approximately ten minutes after the first knock, someone in the house opened the front door.

[4] Deputy Waterman and Lieutenant Perrine looked inside the house and saw five people, one of whom was later identified as Means, sitting on a couch. Edwards was not among the group. The five people fidgeted in their seats and moved their hands. The officers ordered everyone to show them their hands but one person kept moving their hands around. The officers placed all five individuals in handcuffs.

[5] The officers then proceeded to search the house for Edwards. They did not find Edwards, but Deputy Waterman and Lieutenant Perrine did find, in plain sight, a gallon bag of synthetic marijuana, two bags of marijuana, a scale, and other drug paraphernalia. Deputy Waterman then contacted Indianapolis Metropolitan Police Detective Zachary Mauer, who works in the narcotics unit.

[6] Upon arrival, Detective Mauer first questioned the individuals in handcuffs. They all claimed that they did not live there and did not know who the owner was. Detective Mauer then began to prepare an application for a warrant to search the home. As Mauer was typing the application, Deputy Waterman tripped over a vent grate on the floor, looked down, and saw a handgun. The search warrant was granted, and after a complete search of the home, deputies found two additional handguns, including a Glock 27, and small baggies of marijuana.

[7] On February 9, 2017, the State charged Means with Level 4 felony unlawful possession of a firearm by a serious violent felon; Level 5 felony possession of a narcotic drug; Level 6 felony dealing in marijuana; Level 6 felony dealing in a synthetic drug or synthetic drug lookalike substance; Level 6 felony possession of marijuana; and Class A misdemeanor possession of a synthetic drug or synthetic drug lookalike substance.

[8] On February 10, 2017, at Means's initial hearing, the judge found no probable cause and ordered Means released. After his release order had been signed, Means was waiting in the book-out area of the jail. As he waited, he shouted across the room to another inmate that "he had a Glock 27 but they couldn't charge him with it." Tr. Vol. III p. 34. Marion County Sheriff's Deputy Jedediah Capps overheard this statement and told Means, "you know you just admitted to a police officer, to a deputy." *Id.* at 35. Deputy Capps testified that Means replied, "I don't care, I'm getting out anyway." *Id.*

[9] Deputy Capps contacted Detective Mauer and told him what Means had said. Detective Mauer amended the probable cause affidavit and requested that Means be held in custody. The trial court granted the amended affidavit's request and Means was held pending bond. On February 15, 2017, the judge found probable cause to proceed with the case.

[10] On April 17, 2017, Means filed a motion to suppress, arguing that he was improperly seized after the officers illegally executed the arrest warrant. He claimed that all the evidence discovered as a result of this illegal entry should be

suppressed. On May 31, 2017, the trial court orally denied Means' motion to suppress.

[11] Before trial, the State dismissed all charges except for Level 4 felony possession of a handgun by a serious violent felon. Following Means's October 19, 2017, jury trial, the jury found Means guilty as charged. On October 31, 2017, the trial court imposed a ten-year sentence. Means now appeals.

# Discussion and Decision

[12] Means argues that the trial court erred by denying his motion to suppress the evidence, but because he is appealing following a completed trial, the issue is properly framed as an argument regarding the admission of the evidence at trial. *E.g.*, *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). We will only reverse a trial court's ruling on admission of evidence if the decision is clearly against the logic and effect of the facts and circumstances before the court. *D.F. v. State*, 34 N.E.3d 686, 688 (Ind. Ct. App. 2015). In conducting our review, we will neither reweigh the evidence nor assess witness credibility, but we apply a de novo standard of review to matters of law. *Id.* In other words, when a defendant contends that the trial court admitted evidence alleged to have been discovered as the result of an illegal search or seizure, an appellate court will generally assume the trial court accepted the evidence as presented by the State and will not reweigh that evidence, but we owe no deference as to whether that evidence established the constitutionality of the search or seizure. *Id.* at 689.

# I. Fourth Amendment

Means argues that he was seized as the result of an unconstitutional execution of Edwards's arrest warrant. The State first responds that Means does not have standing to raise this argument because he had no reasonable expectation of privacy in the house that was searched; Means counters that because he was seized pursuant to the arrest warrant, he has standing to challenge it. We will assume for argument's sake that Means has standing to raise a Fourth Amendment claim.

Means first argues that the execution of the arrest warrant was illegal because the warrant was based on faulty and insufficient information. The Fourth Amendment protects people from unreasonable search and seizure. U.S. Const. amend. IV. With respect to arrest warrants,

> the police may not enter a home by force to make a "routine" arrest without a warrant. An arrest warrant founded on probable cause gives the police "limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." The belief is judged on the information available to the officers at the time of entry and need not prove to have been correct in hindsight.

*Duran v. State*, 930 N.E.2d 10, 15 (Ind. 2010) (internal citations omitted) (quoting *Payton v. New York*, 445 U.S. 573, 603 (1980)). It is generally accepted that "reason to believe" involves something less than probable cause. *Id.* Police officers must have a reasonable belief that the dwelling is the residence of

the subject of the warrant and that the subject is present at the time the officers attempt to enter on authority of an arrest warrant. *Id.* at 16.

[15] Here, Deputy Waterman explained that before serving a warrant, the Criminal Warrant Unit is given a packet of information to aid in its service. Intelligence analysts who work for the intelligence unit with the Marion County Sheriff's Office are responsible for creating the packets of information. The packets generally contain the warrant itself; the subject's name, address, picture, and date of birth; information about the subject's friends and what vehicle he drives; and what offense the subject is being arrested for.

[16] The packet for Edwards's arrest contained the arrest warrant, which listed an address of 539 North Gray Street. On an information page also in the packet, this address appears again; directly to the right of this address is a heading that reads, "Date of Info," and under this heading is the date "1/25/2017[.]" Tr. Ex. 1 p. 3.

[17] Means contends that the warrant and the packet did not give the officers a reason to believe that 539 North Gray Street was Edwards's residence or that Edwards would be home at the time the warrant was served. Consequently, Means maintains that the officers' entry into the home violated the Fourth Amendment.

[18] We do not find Means's argument to be persuasive. The warrant and accompanying packet contained the same address multiple times; no other addresses were listed. The "Date of Info" information page indicates that the

warrant was served less than two weeks after the most recent information on Edwards's address was obtained.[2] As the information was consistent and not stale, we find that the officers had a reason to believe that Edwards was living at 539 North Gray Street.

[19] Means directs our attention to *Duran v. State*, 930 N.E.2d 10 (Ind. 2010), in support of his argument, but we find that case easily distinguishable from the present circumstances. In *Duran*, officers went to the address listed on an arrest warrant but did not find its target at that address. They then received information from another officer indicating that the warrant's subject lived at a particular apartment complex. The information did not include the apartment number, however. When the officers went to the apartment complex, they confronted a random person leaving the building and spoke with him; that person indicated that the subject lived in an upstairs apartment with a green door. Officers did nothing to determine this person's basis of knowledge, knowledge of the subject, or residency in the complex. The officers went to the apartment with the green door, knocked, and after receiving no response, broke down the door. Our Supreme Court held that under these circumstances, the officers had insufficient information to form a reasonable belief that the subject was living in the apartment into which they forcibly broke. *Id.* at 16-17.

---

[2] Means complains that there is no evidence in the record establishing what, precisely, "Date of Info" refers to, and also notes that other pages of the packet indicate that it was printed on February 7, 2017—the day after the warrant was executed. Nonetheless, we believe it perfectly reasonable to conclude that "Date of Info" refers to the date on which the information—Edwards's address—was obtained.

[20]     In this case, the officers had information from their intelligence unit regarding the most recent (and only) address associated with Edwards. Whereas in *Duran*, the police's information was from a random, unknown, unverified source, the information in this case came from an intelligence unit with the Marion County Sheriff's Office. Unlike in *Duran*, the officers in this case were entitled to rely upon the information in these packets.[3] Therefore, the arrest warrant was based on sufficient information and its execution did not violate the Fourth Amendment.[4]

[21]     Means next argues that even if the warrant itself was valid, the officers' seizure of him was unconstitutional because he was not named in the warrant. He notes that while caselaw holds that officers have the right to seize the occupants of a home in which they are executing a *search* warrant, there is no such articulated right during the execution of an *arrest* warrant. *See Michigan v. Summers*, 452 U.S. 692, 705 (1981) (holding that it is constitutionally permissible to detain the occupants of a home pursuant to a search warrant so that a proper search can be conducted).

---

[3] Moreover, whereas in *Duran*, the officers knocked down the door, in this case, the officers entered after an occupant of the house opened the door for the officers.

[4] Means also argues that the officers did not have a reasonable belief that Edwards would be home at the time of day they served the warrant. Service occurred around 9:00 p.m. on a weekday, which is a time of day when most people are home. It was reasonable for the officers to believe that Edwards would have been home at that time.

[22] We agree with the State that the same reasons that justify detentions of people in a house where a search warrant is being executed should likewise justify detentions of people in a house where an arrest warrant is being executed. Among other things, the *Summers* Court noted that there is an "obvious . . . legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found." *Id.* at 702. Moreover, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Id.* As the State aptly notes, "[t]he touchstone of the Fourth Amendment is reasonableness, and, just as it is reasonable for officers to detain those people present in a home where a search warrant is [being] executed, it is likewise reasonable to freeze the scene where an arrest warrant is being executed, especially when the subject of their search could be waiting in the wings to either flee or fight." Appellee's Br. p. 19.

[23] As a general matter, therefore, it may be proper for law enforcement officers to "freeze the scene" by detaining occupants of a house while they search the house for the subject of the arrest warrant being executed, to prevent flight and to minimize the risk of harm to all involved. And in this particular case, the officers had reason to be concerned both that Edwards was hiding in the home and that flight was a possibility, given the furtive and panicky behavior of the occupants of the home after Deputy Waterman knocked on the front door. Under these circumstances, we find that the seizure of Means did not violate the Fourth Amendment even though he was not named in the arrest warrant.

[24] In sum, there was sufficient reliable information supporting the arrest warrant, and the fact that Means was not named therein does not mean that his seizure was unconstitutional. We find that the execution of the arrest warrant did not violate Means's Fourth Amendment rights and that the trial court did not err by admitting the evidence at issue.

## II. Article I, Section 11

[25] Means also challenges the execution of the arrest warrant under Article I, Section 11 of the Indiana Constitution. Although this provision directly tracks the Fourth Amendment of the United States Constitution, the analysis under Article 1, Section 11 "turns on an evaluation of the reasonableness of the officers' conduct under the totality of the circumstances." *Tate v. State*, 835 N.E.2d 499, 507 (Ind. Ct. App. 2005). The reasonableness of an officer's conduct depends on a "balance of: 1) the degree of concern, suspicion or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005).

[26] The parties again disagree on whether Means has standing to raise a claim under the Indiana Constitution. We again assume for argument's sake that he does.

[27] First, we find that there was a substantial degree of concern, suspicion or knowledge that a violation had occurred. An arrest warrant for Edwards had

been issued. The warrant and the packet of information provided by the intelligence unit showed 539 North Gray Street as Edwards's address, and it was reasonable to believe based on the packet that the address information was less than two weeks old. This information came from an intelligence unit of a law enforcement agency, and there is no authority requiring that more than this is required to walk up to a house and knock on the door to serve the arrest warrant. Furthermore, after knocking on the front door, the officers heard multiple people in the house running around, barricading a side door, and expressing dismay that the police were there. It was approximately ten minutes after the officers first knocked that someone finally opened the door, and when they looked inside, they did not see Edwards. These facts and circumstances supplied the officers with a high degree of suspicion that Edwards was hiding elsewhere in the house.

[28] Second, we find that the degree of intrusion was moderate. Means was handcuffed and prohibited from leaving the premises while the officers searched the house for Edwards. The search was relatively brief, however, and had no contraband been discovered, Means would have been allowed to leave in a timely fashion. Tr. Vol. II p. 58 (testimony of narcotics Detective Mauer that he received the call regarding the drugs found during the search from Deputy Waterman around 9:45 p.m.), 158 (testimony of Deputy Waterman that the team arrived at the residence at 8:59 p.m.).

[29] Finally, the extent of law enforcement needs was high. They were executing an arrest warrant, which is an order to find a person, secure them, and bring them

before the court. The officers at the scene observed furtive and panicky behavior from the occupants of the house, leading to a suspicion that Edwards was hiding somewhere inside. To ensure that they could conduct a safe search and prevent flight, the officers had a significant need to detain the occupants of the house.

[30] We find that under the totality of these circumstances, the decision to detain the occupants of the house for a brief time while the officers conducted a protective sweep to look for Edwards was reasonable. Means's rights under Article 1, Section 11 of the Indiana Constitution were not violated and the trial court did not err by admitting the evidence at issue.

[31] The judgment of the trial court is affirmed.

Kirsch, J., and Bradford, J., concur.