



FILED

Jun 23 2020, 2:18 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 20S-CR-418

## Brian E. Hardin,
*Appellant (Defendant),*

—v—

## State of Indiana,
*Appellee (Plaintiff).*

---

Argued: September 26, 2019 | Decided: June 23, 2020

Appeal from the Morgan Circuit Court,
No. 55C01-1709-F2-1851
The Honorable Matthew G. Hanson, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 18A-CR-2629

---

**Opinion by Justice Goff**

Justice Massa concurs.
Justice Slaughter concurs with separate opinion.
Justice David concurs in part, dissents in part with separate opinion in which
Chief Justice Rush joins.

**Goff, Justice.**

Both our federal and state constitutions provide protections from unreasonable searches and seizures. This case implicates those protections by raising the following question: Do law-enforcement officers violate either constitution by searching a person's vehicle when the person drives that vehicle up to his or her house while officers are there executing a search warrant for the house that does not address vehicles? Based on the circumstances here, we answer "no" and affirm the trial court. In arriving at that answer, we provide guidance on the test applicable to these specific types of situations under the Fourth Amendment to the United States Constitution. We also survey our precedent under Article 1, Section 11 of the Indiana Constitution and provide generally applicable guidance on our totality-of-the-circumstances test.

# Factual and Procedural History

Late one night in September 2017, a team of four law-enforcement officers prepared to execute a warrant to search Brian Hardin's home in Camby, Indiana. The search sprang from a multi-agency investigation into the alleged drug-dealing activities of several people, including Hardin. As part of this investigation, officers wiretapped one of Hardin's confederates, Jerry Hall, and intercepted communications between the two men regarding the purchase and distribution of methamphetamine. Officers also observed Hardin driving a truck, registered in his name, to his home in Camby and Hall's home in Indianapolis. Indiana State Police (ISP) Detective Joshua Allen put this information in an affidavit seeking a warrant to search Hardin's home for drugs and related items. The Morgan Superior Court issued the warrant but did not address the treatment of vehicles that might be found on the premises.

The four officers, including Detective Allen, forcibly entered Hardin's home, learned that no one else was there, and began their search. In the garage, they found digital scales and "heat seal bags that contained a crystal substance" which tested positive for methamphetamine. Tr. Vol. 2, p. 93. The officers also found syringes and two "pay and owe sheets,"

which Detective Allen described as ledgers to keep track of who owed money for drugs provided. *Id.* at 118. While the officers were at the home, Hardin's girlfriend and her daughter arrived, and the officers escorted them both inside the home for supervision. Also during the search, the officers learned from police executing a search warrant on Hall's home in Indianapolis that Hardin had recently obtained a large amount of methamphetamine from Hall.

Based on this information, Detective Allen and ISP Trooper John Patrick left in separate vehicles to try to find Hardin. ISP Detective Matt Fleener and ISP Trooper Kent Rohlfing stayed behind in case Hardin came back to the home.

While Detective Allen and Trooper Patrick looked for their suspect, Hardin returned home. Trooper Rohlfing, covering the front door of Hardin's home, saw a truck pull into the driveway and heard the overhead-garage door open. A few seconds later, Hardin opened the door between the garage and kitchen, which Detective Fleener was covering. Detective Fleener identified himself as a law-enforcement officer and quickly closed the gap between himself and a backpedaling Hardin. After a scuffle, Detective Fleener and Trooper Rohlfing handcuffed Hardin and had him sit in a chair. They then called EMS to tend to Hardin's minor injuries and informed Detective Allen and Trooper Patrick that Hardin was in custody at the home.

Detective Allen and Trooper Patrick returned to the home, and Detective Allen searched the vehicle Hardin drove into his driveway—the same one officers observed him driving during previous surveillance. Detective Allen found 108 grams of crystal methamphetamine in a black bag underneath the driver's seat.

The State charged Hardin with two counts: dealing in methamphetamine and possession of methamphetamine. It also sought a habitual-offender enhancement, which it later dismissed.

Hardin filed a pretrial motion to suppress the evidence obtained during the search. Basing his argument on both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana

Constitution, Hardin argued that the officers exceeded the scope of the warrant by searching his vehicle, which was not mentioned in the warrant. After a hearing, the trial court denied the suppression motion. Specifically, the trial court found that Hardin's vehicle, parked in the driveway to his home, was within the curtilage of the home and therefore fell within the scope of the warrant. Alternatively, the court found that probable cause and the automobile exception to the Fourth Amendment's warrant requirement supported the search of Hardin's vehicle. Hardin did not seek interlocutory appeal, and the case proceeded to a bench trial.

At trial, Hardin objected to the introduction of the evidence obtained during the search of his vehicle, reiterating and incorporating the suppression arguments he previously made. The trial court overruled the objection and admitted the evidence. Ultimately, the court found Hardin guilty of both counts—dealing in and possession of methamphetamine—and sentenced him to an aggregate term of nearly twenty-two years.

Hardin appealed, challenging the admission of the evidence found in his vehicle based on the Fourth Amendment and Article 1, Section 11. The Court of Appeals affirmed in a split decision. *Hardin v. State*, 124 N.E.3d 117 (Ind. Ct. App. 2019). Relying on recent precedent from the Court of Appeals and the fact that Hardin did not challenge the trial court's finding that his vehicle was within the curtilage of his home, the majority found that the search did not violate the Fourth Amendment. *Id.* at 123–24. It likewise found no violation of Article 1, Section 11 based on the totality of the circumstances. *Id.* at 124. Judge Mathias, however, dissented. *Id.* at 125–26 (Mathias, J., dissenting). In concluding that the search violated both our federal and state constitutions, he focused on the relative ease with which the law-enforcement officers could have included a description of Hardin's vehicle in the warrant for the home and with which they could have obtained a separate warrant specifically for the vehicle. *Id* (Mathias, J., dissenting).

Hardin petitioned for transfer, which we now grant, thereby vacating the Court of Appeals opinion. *See* Ind. Appellate Rule 58(A).

## Standard of Review

We review a trial court's ruling on the admissibility of evidence at trial for an abuse of discretion. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). "But the ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo." *Id*.

## Discussion and Decision

Hardin argues that the trial court should not have admitted the evidence found during the search of his vehicle because the search violated the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. He acknowledges that the law-enforcement officers obtained a warrant for his home and that the trial court found that his vehicle was within the home's curtilage when the officers searched it. Neither Hardin nor the State asks us to address whether the vehicle was parked within the home's curtilage, so we assume without deciding that the trial court correctly resolved that issue. Instead, Hardin contends that the search was constitutionally unreasonable and not supported by the warrant for his home, which addressed neither vehicles generally nor his vehicle specifically. We consider the nuances of this argument under the Fourth Amendment and Article 1, Section 11 below.

## I. The search of Hardin's vehicle did not violate the Fourth Amendment because the vehicle fell within the scope of the warrant for Hardin's home.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the
persons or things to be seized.

A warrant covering a house allows searches of things and places within the house that could contain the object of the search. *United States v. Ross*, 456 U.S. 798, 820–21 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."). The boundaries of a house for Fourth Amendment purposes extend beyond the physical structure of the house itself to include the curtilage—that is, "the area immediately surrounding and associated with the home." *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (citations omitted). Thus, the holding of *Ross* extends into the curtilage, meaning that a warrant for a house generally allows searches of the things and places located in the curtilage that could contain the object of the search. *See Sowers v. State*, 724 N.E.2d 588, 590–91 (Ind. 2000). This case tests the limits of that established Fourth Amendment jurisprudence. Specifically, it requires us to answer the following question: When can police, armed with a warrant to search a home, search a vehicle located in the home's curtilage?[1]

In answering this question of first impression for our Court, "we consider the opinions and law of other jurisdictions as helpful to our analysis." *Ackerman v. State*, 51 N.E.3d 171, 180 (Ind. 2016). Other courts faced with this question have generally fallen into one of two broad groups, differing in whether they consider who owns or controls the vehicle to be searched.

---

[1] The warrant here described the premises without placing any specific limitation on searches of vehicles. The inclusion of such a limitation in a warrant could change the analysis. *See United States v. Johnson*, 640 F.3d 843, 845–46 (8th Cir. 2011) (noting that warrants may contain limitations on vehicle searches, constraining officers' authority to search).

Courts in one group don't consider ownership or control of the vehicle at all.  They allow searches of any vehicle found on the premises for which a warrant has been issued.

- *See, e.g., United States v. Singer*, 970 F.2d 1414, 1418 (5th Cir. 1992) ("This court has consistently held that a warrant authorizing a search of 'the premises' includes vehicles parked on the premises.");
- *United States v. Armstrong*, 546 F. App'x 936, 939 (11th Cir. 2013) (unpublished) (stating that a search warrant for "the 'property' at the described location . . . is sufficient to support a search of a vehicle parked on the premises");
- *McLeod v. State*, 772 S.E.2d 641, 646 (Ga. 2015) (citation omitted) ("Vehicles parked within the curtilage of a dwelling to be searched pursuant to a warrant may also be searched pursuant to that warrant.").
- *See generally* 2 Wayne R. LaFave, Search and Seizure § 4.10(c), at 955–56 (5th ed. 2012 & Supp. 2019) (noting that many decisions do not suggest a limitation to which vehicles on a property being searched pursuant to a warrant may be searched).

Courts in the other group do consider ownership or control of the vehicle in determining whether it falls within the scope of the warrant. These courts differ slightly in how they describe the test, but they generally exclude guests' vehicles from the scope of a warrant for a home while allowing law-enforcement officers to search the vehicles of the home's owner or resident.

- *See, e.g., United States v. Gottschalk*, 915 F.2d 1459, 1461 (10th Cir. 1990) (defining the scope of a premises search warrant "to include those automobiles either actually owned or under the control and dominion of the premises owner or, alternatively, those vehicles which appear, based on objectively reasonable indicia present at the time of the search, to be so controlled");
- *United States v. Patterson*, 278 F.3d 315, 318 (4th Cir. 2002) (citing *Gottschalk*, 915 F.2d at 1461) (providing the same rule);
- *United States v. Duque*, 62 F.3d 1146, 1151 (9th Cir. 1995) (citation omitted) (holding that "a search warrant authorizing a search of a

particularly described premises may permit the search of vehicles owned or controlled by the owner of, and found on, the premises");

- *United States v. Pennington*, 287 F.3d 739, 745 (8th Cir. 2002) (citation omitted) (noting that, even when not specifically listed in a warrant, "a vehicle found on the premises (except, for example, the vehicle of a guest or other caller) is considered to be included within the scope of a warrant authorizing a search of the premises");

- *United States v. Evans*, 92 F.3d 540, 543–44 (7th Cir. 1996) (stating that a warrant to search a house allows law enforcement to search a vehicle within the premises "unless [the vehicle] obviously belonged to someone wholly uninvolved in the criminal activities going on in the house");[2]

- *State v. Patterson*, 371 P.3d 893, 899 (Kan. 2016) (adopting the test as outlined by the Tenth Circuit in *Gottschalk*).

- *See generally* 2 LaFave, Search and Seizure § 4.10(c), at 955–56 (asserting that "the conclusion that a description of premises covers vehicles parked thereon should at least be limited to vehicles under the control (actual or apparent) of the person whose premises are described").

Although courts in this group initially spoke of searching vehicles of the homeowner rather than resident (such as a renter), they later interpreted the rule to cover both. *See, e.g., Evans*, 92 F.3d at 543 ("We cannot think of any reason for distinguishing between an owner and a tenant, or for that matter between an owner or tenant on the one hand and a sublessee or intermittent occupant . . . on the other."); *United States v. Hohn*, 606 F. App'x 902, 909 (10th Cir. 2015) (unpublished).

---

[2] *Evans* appears to have shifted the Seventh Circuit's jurisprudence in this area toward a presumption that a vehicle found on premises subject to a search warrant may be searched, except in special situations. *Compare Evans*, 92 F.3d at 543–44, *with United States v. Percival*, 756 F.2d 600, 612 (7th Cir. 1985) (holding "that a search warrant authorizing a search of particularly described premises may permit the search of vehicles owned or controlled by the owner of, and found on, the premises").

We find that the better of these two approaches is to consider ownership or control of a vehicle in determining whether it falls within the scope of a general premises warrant, excluding vehicles of guests or other visitors from the warrant's scope. Vehicles of guests and other visitors to a home are on the property only temporarily, whether it's to visit with a friend, to deliver a package, or for some other reason. When a warrant for a home fails to mention such a transient vehicle, the probable cause supporting the warrant does not extend to that vehicle which happens to be temporarily on the property when officers execute the warrant. *See* 2 LaFave, Search and Seizure § 4.10(c), at 956–57 ("[T]he probable cause determination made by the magistrate [regarding the home to be searched] does not extend to the vehicle the visitor has left outside."). However, the probable cause supporting a warrant for a home would extend to the owner or resident's vehicle given the close, long-term connections between the owner/resident, the home, and the vehicle. Thus, we conclude that a general warrant to search a specifically described premises like a home includes the ability to search vehicles within the curtilage that could contain the object of the search and that are "either actually owned or under the control and dominion of the premises owner [or resident] or, alternatively, those vehicles which appear, based on objectively reasonable indicia present at the time of the search, to be so controlled." *Gottschalk*, 915 F.2d at 1461. *Accord* 2 LaFave, Search and Seizure § 4.10(c), at 955–56 ("[T]he conclusion that a description of premises covers vehicles parked thereon should at least be limited to vehicles under the control (actual or apparent) of the person whose premises are described.").[3]

This test is easily met here. Neither party challenges the trial court's finding that Hardin's vehicle was in the home's curtilage when law enforcement searched it, and the vehicle could contain the drugs and

---

[3] Applying this test under normal circumstances, a general warrant to search a home will cover a vehicle in a garage attached to the home or in the curtilage. *See State v. Lucas*, 112 N.E.3d 726, 730–31 (Ind. Ct. App. 2018) (upholding this type of search under a slightly tougher standard).

related items described in the search warrant. And three independent bases supported the connection between Hardin and his vehicle. First, police knew, based on their prior observations of Hardin and the vehicle's registration, that Hardin owned the vehicle. Second, police knew that the vehicle was under Hardin's control by their prior observations of him driving it combined with the fact that he drove it to his house right before the search. *See United States v. Rivera*, 738 F. Supp. 1208, 1218–19 (N.D. Ind. 1990) (upholding a search of a truck that officers had seen the defendant drive up the driveway of his house right before the search and on other, prior occasions). Third, even if the police didn't know that he owned and controlled the vehicle, his act of driving it into his own driveway right before the search represents an objectively reasonable indicator of his control over the vehicle. As a result, the general premises warrant permitting law enforcement's search of Hardin's home also supported law enforcement's search of his vehicle, and this search did not violate the Fourth Amendment.[4]

## II. The search of Hardin's vehicle did not violate Article 1, Section 11 because it was reasonable based on the totality of the circumstances.

Hardin also argues that the search of his vehicle violated Article 1, Section 11 of the Indiana Constitution. Although Article 1, Section 11 contains language nearly identical to the Fourth Amendment, we interpret Article 1, Section 11 independently. *See Shotts v. State*, 925 N.E.2d 719, 726 (Ind. 2010). In cases involving this provision of our Constitution, the State must show that the challenged police action was reasonable based on the totality of the circumstances. *Robinson v. State*, 5 N.E.3d 362, 368 (Ind. 2014). *See also Austin v. State*, 997 N.E.2d 1027, 1034 (Ind. 2013) (quoting *Duran v. State*, 930 N.E.2d 10, 17 (Ind. 2010)) ("'[W]e focus on the actions of

---

[4] Because we find that the officers searched Hardin's vehicle pursuant to the warrant, we do not address Hardin's alternate argument concerning the automobile exception to the Fourth Amendment warrant requirement.

the police officer,' and employ a totality-of-the-circumstances test to evaluate the reasonableness of the officer's actions.").

Important competing interests underlie this totality-of-the-circumstances test to determine reasonableness. On one hand, Hoosiers want to limit excessive intrusions by the State into their privacy. *See, e.g.,* *State v. Washington*, 898 N.E.2d 1200, 1206 (Ind. 2008) (citing *State v. Quirk*, 842 N.E.2d 334, 339–40 (Ind. 2006)) ("The purpose of this section is to protect those areas of life that Hoosiers consider private from unreasonable police activity."); *Membres v. State*, 889 N.E.2d 265, 274 (Ind. 2008) (noting that the Article 1, Section 11 test "is designed to deter random intrusions into the privacy of all citizens"). And so we liberally construe Article 1, Section 11 to protect individuals. *Marshall v. State*, 117 N.E.3d 1254, 1261 (Ind. 2019) (quoting *Holder v. State*, 847 N.E.2d 930, 940 (Ind. 2006)); *Grier v. State*, 868 N.E.2d 443, 444 (Ind. 2007) (citing *State v. Gerschoffer*, 763 N.E.2d 960, 965 (Ind. 2002)). On the other hand, Hoosiers are interested in supporting the State's ability to provide "safety, security, and protection from crime." *Holder*, 847 N.E.2d at 940 (quoting *Gerschoffer*, 763 N.E.2d at 966). By employing a totality-of-the-circumstances test, we aim to strike the proper balance between these competing interests in light of Article 1, Section 11's protection from unreasonable searches and seizures. *See id.* ("It is because of concerns among citizens about safety, security, and protection that some intrusions upon privacy are tolerated, so long as they are reasonably aimed toward those concerns.").

We provided a framework for conducting this totality-of-the-circumstances test for reasonableness in *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005). *See also Watkins v. State*, 85 N.E.3d 597, 600 (Ind. 2017) (noting the comprehensive application of *Litchfield* to Article 1, Section 11 claims). While acknowledging the possibility of "other relevant considerations under the circumstances," we stated that the reasonableness of a law-enforcement officer's search or seizure requires balancing three factors: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield*, 824 N.E.2d at 361. When weighing these factors as part of our totality-of-the-circumstances test, we

consider the full context in which the search or seizure occurs. *Garcia v. State*, 47 N.E.3d 1196, 1199 (Ind. 2016). *See also Austin*, 997 N.E.2d at 1034–37 (examining the challenged traffic stop and search as part of the longer chain of interactions between the defendant and law enforcement around the time of the stop and search); *Quirk*, 842 N.E.2d at 340–43 (same). So, we examine, at different points in our analysis, the perspectives of both the officer and the person subjected to the search or seizure. *Garcia*, 47 N.E.3d at 1199. And, while the existence of a valid warrant certainly plays an important role in our review, a warrant does not necessarily make all law-enforcement action related to the warrant reasonable. *Sowers*, 724 N.E.2d at 591. *See also Watkins*, 85 N.E.3d at 601–03 (analyzing whether law enforcement's method of executing a search warrant violated Article 1, Section 11). Thus, the *Litchfield* factors provide guidance and structure to our analysis of Article 1, Section 11 claims while staying true to considering the totality of the circumstances.

With this general guidance in mind, we now address the *Litchfield* factors, summarizing guiding principles specific to each and considering the facts here.

## A. The Degree of Police Concern, Suspicion, or Knowledge

### 1. Specific Guiding Principles

We begin our analysis by examining the law-enforcement officers' "degree of concern, suspicion, or knowledge that a violation has occurred." *Litchfield*, 824 N.E.2d at 361. In evaluating the officers' degree of suspicion, we consider all "the information available to them at the time" of the search or seizure. *Duran*, 930 N.E.2d at 18. This includes the officers' knowledge of the existence of a valid search warrant, which provides strong support for an officer's concern that a violation has

occurred and that evidence of the violation will be found in the place identified in the warrant to be searched. *Watkins*, 85 N.E.3d at 601.[5]

## 2.   Application

Here, the search of Hardin's vehicle was supported not only by a warrant but also by very recent information indicating that evidence of criminal activity would be in the vehicle.

The officers had obtained a warrant for Hardin's home, and Hardin does not challenge the conclusion that he parked his vehicle within the curtilage of the home—an area that, at least for Fourth Amendment purposes, is considered "part of the home itself." *Collins*, 138 S. Ct. at 1670 (citation omitted). While the warrant did not specifically identify Hardin's vehicle, it provided strong support for the officers' belief that Hardin was involved in illegal drug activity in and around his home. Indeed, the search of the home prior to Hardin's arrival confirmed this belief when it revealed items consistent with dealing drugs. And in conducting surveillance prior to obtaining the warrant, officers observed Hardin driving his vehicle to and from his home, and they knew that the vehicle was registered to him.

In addition to the warrant, the officers also had recent information indicating that Hardin would have drugs in his vehicle. During the search of Hardin's home, the officers learned from police executing a separate warrant that Hardin had recently picked up a large amount of methamphetamine from Jerry Hall.

So, before officers searched Hardin's vehicle, they knew he was involved in illegal drug activities in and around his home, they found drug-related items in the home but a conspicuous absence of the drugs themselves, and they heard that Hardin had just received a large amount

---

[5] The focus of this factor can change slightly depending on the action challenged. For example, when a defendant challenges the reasonableness of an arrest-warrant execution, we do not test the arresting officer's concern that a violation has occurred. Instead, we test the officer's belief regarding the location and presence of the defendant. *Duran*, 930 N.E.2d at 18.

of methamphetamine.  Hardin then drove his vehicle up the driveway to his home.  At this point, with all the information the officers knew, they had an extremely strong basis to believe that they would find drugs in Hardin's vehicle.  *See* Tr. Vol. 2, p. 25 (Detective Allen testifying, "[W]hen we were done searching the house and we hadn't found [the methamphetamine], it . . . was my thought that [Hardin] would have that on his person.  Which is common.").

## B.  The Degree of Intrusion

### 1.    Specific Guiding Principles

The second *Litchfield* factor we consider is "the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities."  *Litchfield*, 824 N.E.2d at 361.  In the years since *Litchfield*, we have given several points of guidance regarding this factor.

First, we consider the degree of intrusion from the defendant's point of view.  *Carpenter*, 18 N.E.3d at 1002.  Thus, a defendant's consent to the search or seizure is relevant to determining the degree of intrusion. *Duran*, 930 N.E.2d at 18 n.4.

Second, when examining the degree of intrusion into the citizen's ordinary activities, we consider the intrusion into both the citizen's physical movements and the citizen's privacy.  We have focused on the degree of intrusion into the defendant's physical movements in our traffic-stop cases.  *See Austin*, 997 N.E.2d at 1035–36 (comparing the facts of that case with those in *Quirk*); *State v. Hobbs*, 933 N.E.2d 1281, 1287 (Ind. 2010).  And in our trash-search cases and others, we have focused on the intrusion into the defendant's privacy.  *See Duran*, 930 N.E.2d at 18;

*Litchfield*, 824 N.E.2d at 363–64.  But both types of intrusions—into physical movement and privacy—are relevant to this *Litchfield* factor.[6]

Third, by focusing on the degree of intrusion caused by the **method** of the search or seizure, we're saying that **how** officers conduct a search or seizure matters.  For example, we have found a high degree of intrusion when officers executed a search warrant using a battering ram, flash-bang grenade, and SWAT team as well as when officers conducted a warrantless strip search of a misdemeanor arrestee as a matter of course. *Watkins*, 85 N.E.3d at 601–02 (search warrant); *Garcia*, 47 N.E.3d at 1201–02 (citing *Edwards v. State*, 759 N.E.2d 626, 629 (Ind. 2001)) (strip search).  In examining the way that officers conduct a search or seizure, we continue to consider the totality of the circumstances and look at "all of the attendant circumstances"—not a single aspect of the search or seizure in isolation. *Garcia*, 47 N.E.3d at 1202.  This includes considering whether officers conduct their search or seizure pursuant to a warrant since a warrant informs the subject of the search or seizure of the limitations imposed on the officers' actions by a detached judicial officer. *See Carpenter*, 18 N.E.3d at 1002 (considering the lack of a warrant in examining the degree of intrusion).[7]

Fourth, privacy interests in vehicles do not render them beyond the reach of reasonable police activity.  Hardin relies on our statement that "Hoosiers regard their automobiles as private and cannot easily abide

---

[6] Considering privacy in this factor should not be confused with a test for reasonableness that focuses exclusively on the defendant's expectation of privacy, which we've expressly rejected. *Litchfield*, 824 N.E.2d at 359.  Instead, as noted above, "'we focus on the actions of the police officer,' and employ a totality-of-the-circumstances test to evaluate the reasonableness of the officer's actions." *Austin*, 997 N.E.2d at 1034 (quoting *Duran*, 930 N.E.2d at 17).  Considering how an officer's actions intrude on the defendant's privacy constitutes merely a piece of our totality-of-the-circumstances test.

[7] We hasten to reiterate that whether officers have a warrant is only one piece of the puzzle. Specifically regarding this degree-of-intrusion factor, officers may still greatly intrude on a person's ordinary activities when armed with a warrant. *See Watkins*, 85 N.E.3d at 601–02 (noting a high degree of intrusion despite the existence of a warrant). *See also Duran*, 930 N.E.2d at 18–19 (noting that the possibility that officers could have obtained a warrant did not reduce the degree of intrusion).

their uninvited intrusion" to argue for a high degree of intrusion here. *See Brown v. State*, 653 N.E.2d 77, 80 (Ind. 1995). But Hardin reads *Brown* too broadly in connection with this factor. We agree that Hoosiers regard vehicles as private areas not subject to random police rummaging. *See Taylor v. State*, 842 N.E.2d 327, 334 (Ind. 2006) ("Automobiles are among the 'effects' protected by Article 1, Section 11."). But that doesn't mean that vehicles are beyond the reach of reasonable law-enforcement activities. We've recognized that "[h]ouses and premises of citizens receive the highest protection," *Carpenter*, 18 N.E.3d at 1002 (citation omitted), yet they are not completely off limits to law enforcement. Read in the proper context, *Brown* is more about low police suspicion or concern and a lack of law-enforcement needs (*Litchfield* factors one and three) than an overly excessive intrusion (this *Litchfield* factor). *Brown*, 653 N.E.2d at 80 (noting both the delay between when a similar-looking vehicle left a crime scene and when police found Brown's vehicle parked on a public street and searched it as well as the lack of need for an immediate, warrantless search). *See also Myers v. State*, 839 N.E.2d 1146, 1153–54 (Ind. 2005) (upholding a warrantless search of a vehicle and distinguishing *Brown* based in part on the low degree of suspicion that the vehicle searched in *Brown* contained contraband). Thus, while we continue to recognize that Hoosiers regard their vehicles as private, *Brown* does not provide an impenetrable shield for those vehicles.

With these specific guiding principles in mind, we turn to the facts of this case to determine the degree of intrusion.

### 2. Application

Here, considering all the attendant circumstances, the search of Hardin's vehicle resulted in a moderate degree of intrusion. We begin by recognizing the obvious intrusion into Hardin's privacy by the search of his vehicle. *Myers*, 839 N.E.2d at 1154 ("[T]he interior search of the defendant's personal car was likely to impose an intrusion . . . ."). However, the degree of that intrusion was lessened by the way officers conducted the search. Hardin does not argue that the officers searched his vehicle in an egregious manner as could've been the case if officers had

torn apart his seats or ripped out his dashboard looking for hidden compartments. *Cf. Bell v. State*, 818 N.E.2d 481, 486 (Ind. Ct. App. 2004) (finding a warrantless search unreasonable under Article 1, Section 11 based on the totality of the circumstances, but before *Litchfield*, when officers "dismantle[d] the vehicle's glove box and searched inside the vehicle's chassis"). Instead, the search appears to have been no more extensive than a visual inspection of the interior of the vehicle—something someone might do to find a credit card or french fry dropped between a seat and the center console. In addition to moderating the intrusion into Hardin's privacy, the officers did not intrude into his physical movements by searching his vehicle since he was already in police custody. *See Hobbs*, 933 N.E.2d at 1287. As a result, the officers' search of Hardin's vehicle resulted in a moderate intrusion.[8]

## C. The Extent of Law-Enforcement Needs

### 1. Specific Guiding Principles

We round out our analysis under the *Litchfield* framework by considering "the extent of law enforcement needs" related to the search or seizure. *Litchfield*, 824 N.E.2d at 361. These law-enforcement needs exist not only when officers conduct investigations of wrongdoing but also when they provide emergency assistance or act to prevent some imminent harm. *Carpenter*, 18 N.E.3d at 1002; *Trimble v. State*, 842 N.E.2d 798, 804 (Ind. 2006).

---

[8] We also note that the officers possessed a warrant to search Hardin's home, and they searched his vehicle in connection with that warrant. However, a warrant does little to lessen the degree of intrusion into a person's privacy—from that person's perspective—when it authorizes a search as a matter of law rather than by its express language. The warrant here did not expressly reference Hardin's vehicle or any other vehicles, so we give it little weight in evaluating the degree of intrusion. But had the warrant expressly included Hardin's vehicle—something the officers could have easily requested—we would have given it more weight, and the admissibility of the evidence from the search may have been clearer.

In reviewing the extent of law-enforcement needs, we look to the needs of the officers to act in a general way. *See Marshall*, 117 N.E.3d at 1262 (recognizing the "need to enforce traffic-safety laws"); *Austin*, 997 N.E.2d at 1036 (recognizing the need to combat drug trafficking).

But we also look to the needs of the officers to act in the particular way and at the particular time they did. *See Duran*, 930 N.E.2d at 19 (finding "[t]he law enforcement needs were not pressing" to execute an arrest warrant when the officers had shaky information on the location of the subject and he was not a flight risk); *Myers*, 839 N.E.2d at 1154 (upholding a search of a vehicle based in part on elevated law-enforcement needs when the vehicle's owner was not under arrest and might have driven the vehicle away). In considering the needs of law-enforcement officers in this more specific way, however, we take a practical approach and do not require officers to undertake duplicative tasks. *See Garcia*, 47 N.E.3d at 1203 (quoting *Guilmette v. State*, 14 N.E.3d 38, 42 (Ind. 2014)) (noting that it "would be extremely cumbersome to require law enforcement to take the 'belt-and-suspenders' approach of applying for an independent warrant anytime they wish to examine or test a piece of evidence they have already lawfully seized").

### 2. Application

Here, the officers had a moderate need to search Hardin's vehicle immediately when he arrived at his home.

Regarding the broad need to act in this situation, we've recognized that law-enforcement needs in combating drug trafficking—"from individual operators to large-scale, corporate-like organizations"—are great. *Austin*, 997 N.E.2d at 1036. The officers here knew of Hardin's methamphetamine-dealing activities from their previous surveillance, and they found evidence of those activities in Hardin's home. Thus, the officers had a general need to stop Hardin's criminal activities.

Hardin argues, however, that the officers did not have a pressing need to immediately search his vehicle, so they should have obtained a separate warrant. This presents a closer question. On one hand, officers may not

have had a pressing need to search the vehicle because Hardin was secured and unable to drive the vehicle away. Also, given the number of law-enforcement agencies and officers involved in executing two search warrants simultaneously, it seems plausible—at least on this record—that the officers at the scene could have called on additional officers to get a separate warrant for the vehicle. On the other hand, there were only four officers present at the scene. They had to secure the people on the property (Hardin, Hardin's girlfriend, and Hardin's girlfriend's daughter) and the property itself, assist EMS personnel, and respond to anyone that might show up later. *See* Tr. Vol. 2, pp. 124–25 (noting that Hardin's mother and her husband arrived at Hardin's home toward the end of the search). And one officer injured his rotator cuff while entering Hardin's home, which impacted his ability to physically secure people. If no other officers were able to assist, it may not have been practical to obtain a separate warrant for the car, increasing the need to immediately search it.

However close a question the officers' immediate needs were, we cannot ignore the other facts of the situation. The officers had a warrant for the home, and Hardin drove his vehicle into the home's driveway, which neither party disputes was part of the curtilage. Requiring the officers to obtain a separate warrant for Hardin's vehicle in this situation would amount to adopting the "cumbersome . . . 'belt-and-suspenders' approach" we rejected in *Garcia* and *Guilmette*. *See Garcia*, 47 N.E.3d at 1203 (quoting *Guilmette*, 14 N.E.3d at 42).

With the officers' general need to combat drug trafficking and their warrant for the home, the officers had at least a moderate need to search Hardin's vehicle.

### D. Balancing the Totality of the Circumstances

Balancing the three *Litchfield* factors based on the totality of the circumstances, we find this search reasonable. **First**, based on the warrant and developments from other investigations, the officers had an extremely high degree of concern that Hardin's vehicle contained illegal drugs. This factor weighs heavily in the State's favor. **Second**, while officers intruded on Hardin's privacy by searching his vehicle, they reduced the degree of

that intrusion by exercising restraint in conducting their search. Their search also did not intrude on Hardin's physical movements since he had already been detained. Thus, while officers moderated the intrusion, they still intruded into his ordinary activities, and this factor weighs moderately in Hardin's favor. **Third**, given the general need to combat drug trafficking and their possession of a warrant for Hardin's home, officers had at least a moderate need to search Hardin's vehicle when they did. This factor weighs moderately in the State's favor. On balance, the moderate intrusion here did not outweigh the law-enforcement concerns and needs, and the search did not violate Article 1, Section 11 of the Indiana Constitution.

# Conclusion

The Fourth Amendment to the United States Constitution and Article 1, Section 11 protect against unreasonable searches and seizures. The search here did not violate the Fourth Amendment because the law-enforcement officers knew that Hardin owned and controlled the vehicle searched and objectively reasonable indicia showed the same, so the vehicle in this situation fell within the scope of the warrant for the home. The search did not violate Article 1, Section 11 because the high degree of law-enforcement concern and moderate law-enforcement need outweighed the moderate intrusion caused by the search, so the search was constitutionally reasonable based on the totality of the circumstances. Thus, we affirm the trial court's admission of the evidence obtained from the search of the vehicle.

Massa, J., concurs.

Slaughter, J., concurs with separate opinion.

David, J., concurs in part, dissents in part with separate opinion in which Rush, C.J., joins.

ATTORNEY FOR APPELLANT

Glen E. Koch, II
Boren, Oliver & Coffey, LLP
Martinsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela Sanchez
Andrew Kobe
Monika Prekopa Talbot
Deputy Attorneys General
Indianapolis, Indiana

**Slaughter, J., concurring.**

I agree that the warrantless search of Hardin's vehicle did not violate his rights under the Fourth Amendment to the United States Constitution or its counterpart in the Indiana Constitution. I join the Court's opinion because I agree with its legal analysis, including how it applied our three-factor *Litchfield* test to Hardin's claims under Article 1, Section 11 of our state constitution. See *Litchfield v. State*, 824 N.E.2d 356 (Ind. 2005).

I write separately, however, to highlight a recurring problem with *Litchfield*. In the fifteen years since we decided *Litchfield*, our case reports have ballooned with examples of ongoing uncertainty among litigants and lower courts with how to apply its three factors for assessing whether challenged law-enforcement activity violates our constitution. See, e.g., *State v. Washington*, 898 N.E.2d 1200 (Ind. 2008) (applying *Litchfield* to undisputed facts, trial court granted motion to suppress, court of appeals affirmed 2–1, and Supreme Court reversed trial court 3–2); *Webster v. State*, 908 N.E.2d 289 (Ind. Ct. App. 2009) (applying *Litchfield*, trial court denied motion to suppress, and court of appeals reversed 2–1).

This longstanding uncertainty is evident here. Although the underlying facts are undisputed, respected jurists at all levels of our judiciary have arrived at different conclusions about what *Litchfield* means for Hardin. The nine judges who have reviewed his case have looked at the same facts and applied the same legal standard. Yet we have reached widely varying conclusions about the legal consequence of these uncontested facts. I cannot imagine a clearer sign of precedent in need of reconsideration.

Under *Litchfield*, no one can predict how courts will decide a given case with a given set of facts. The resulting uncertainty is not good for law enforcement, which needs clear rules so it can conform its conduct to the law. It is not good for individuals, who need clear guidance on whether law enforcement has violated their rights. And it is not good for courts, which must vindicate these rights. In practice, *Litchfield* amounts to a legal Rorschach test—an "eye-of-the-beholder" inquiry incompatible with the rule of law. The problem, I submit, lies not with the disputed constitutional provision but with the test we have devised for interpreting

it. Like most totality-of-the-circumstances tests that balance multiple factors, *Litchfield* is not susceptible to a clear application that produces an obvious legal outcome.

Going forward, I hope the opportunity arises to consider a bright-line rule as a successor test to *Litchfield* for interpreting Article 1, Section 11—one consistent with our framers' constitution and with the text, history, and structure of this constitutional provision.

**David, Justice, concurring in part, dissenting in part.**

I concur in Part I of this opinion and wish to commend the majority's well-reasoned Fourth Amendment analysis. I respectfully dissent from Part II, however, because our state's constitution provides heightened protections for Hoosiers and, in my view, the facts of this particular case weigh differently than the majority's conclusion. I would find that the evidence obtained from Hardin's vehicle must be suppressed because the search was unreasonable under Article 1, Section 11 of the Indiana Constitution.

As the majority correctly recites, even though the language in Article 1, Section 11 of the Indiana Constitution closely tracks the language of the Fourth Amendment, our state's courts interpret the Section separately and independently from the Fourth Amendment. *Robinson v. State*, 5 N.E.3d 362, 368 (Ind. 2014). Section 11's purpose is "to protect from unreasonable police activity those areas of life that Hoosiers regard as private." *Brown v. State*, 653 N.E.2d 77, 79 (Ind. 1995) (citing *Moran v. State*, 644 N.E.2d 536, 540 (Ind. 1994)). Our Court has previously determined that the reasonableness of a search or seizure turns "on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005). Bearing these factors in mind, the State must demonstrate that the police conduct at issue was reasonable under a totality of the circumstances. *Robinson*, 5 N.E.3d at 368 (quoting *State v. Washington*, 898 NE.2d 1200, 1205-06 (Ind. 2008), *reh'g denied*). Importantly, however, these factors are non-exclusive. *See Jacobs v. State*, 76 N.E.3d 846, 852 (Ind. 2017).

In the present case, I believe a warrant not only *could* have been obtained, but that it **should** have been obtained. Much like the majority, I agree that this case demands careful application of our precedent in *Litchfield*. Respectfully, however, I would balance these factors in a way similar to our Court of Appeals colleague Judge Mathias and find that the search of Hardin's vehicle was unreasonable. *See Hardin v. State*, 124

N.E.3d 117, 125–26 (Ind. Ct. App. 2019) (Mathias, J., dissenting). Thus, I would suppress the evidence and remand for a new trial.

The first factor we analyze under *Litchfield* is the degree of concern, suspicion, or knowledge that a violation occurred. 824 N.E.2d at 361. Admittedly, there was a high degree of concern that Hardin was dealing in methamphetamine. The record indicates plenty of validly obtained intelligence that he was discussing buying and selling the drug with another party. While I agree with the majority's conclusion that "very recent information indicat[ed] that evidence of criminal activity would be in the vehicle" (Slip Op. at 13), I disagree that the search of Hardin's vehicle was supported by the warrant obtained in this case because the vehicle was neither mentioned in the warrant nor was it present at the onset of the search. Thus, although there was a high degree of concern that a crime was being committed, there are other factors in play that must be analyzed.

Regarding *Litchfield*'s second factor—the degree of intrusion the method of a search or seizure imposes on a citizen's ordinary activities—I believe the search was highly intrusive for several reasons. Our Court's decision in *Brown v. State*, 653 N.E.2d 77 (Ind. 1995), provides a solid foundation for analyzing this factor. While the *Brown* decision predates the formal totality of the circumstances test announced in *Litchfield*, the case nonetheless turns on the reasonableness of police behavior with respect to "those areas of life that Hoosiers regard as private." *Id*. at 79 (citation omitted). In that case, a police officer seized a vehicle that was thought to have been used in a robbery. After impounding the vehicle, the officer began looking for evidence of the robbery. During that search, Brown arrived and was placed under arrest, and the officer discovered incriminating evidence. Brown challenged the admissibility of the evidence on Article 1, Section 11 grounds, but his motion to suppress was denied and he was ultimately convicted. *See id*. at 79, 81.

On transfer, our Court held the search of the automobile was unreasonable under Article 1, Section 11 based on several, fact-specific circumstances. *Id*. at 80. Of particular note, our Court observed that "there was little likelihood that the car would be moved and thus lost to the

police." *Id*. Additionally, "[t]here was neither a shortage of time nor an emergency," and "the police were not engaged in a community caretaking function." *Id*. Our Court also declared, "With respect to automobiles generally, it may safely be said that Hoosiers regard their automobiles as private and cannot easily abide their uninvited intrusion." *Id*.

While I agree with the majority's conclusion that "*Brown* does not provide an impenetrable shield" for Hoosiers' vehicles (Slip Op. at 16), I read *Brown* for the broader proposition that courts should give pause whenever police engage in searches of a vehicle without a warrant or under the guise of a valid exception to the warrant requirement. My concern extends to other vehicles that may have arrived at Hardin's residence during the search. Would police have carte blanche access to any vehicle that comes on to the property during a warrant's execution? While certainly the State would say "no" to parcel delivery trucks or utility maintenance vehicles, the lines start to blur when it comes to a visiting friend or the occasional person that uses a stranger's driveway to turn their vehicle around. Would these individuals be at risk of a sudden search of their vehicle because they happened to be in the wrong place at the wrong time?

For these reasons, I would conclude there was a high degree of intrusion. True, the police did not use flash-bang grenades, *see Watkins v. State*, 85 N.E.3d 597, 601 (Ind. 2017), nor did police rip apart the car to discover evidence, *see Bell v. State*, 818 N.E.2d 481, 486 (Ind. Ct. App. 2004). And though it is also true that Hardin was under arrest at the time of the search, this is just one consideration when evaluating the level of intrusion imposed by a particular search. The fact remains that Hardin was secured, mere feet away as the officer rifled through his truck, and there was neither a shortage of time nor an emergency. Given *Brown*'s broad statement that Hoosiers regard their vehicles as private, I believe these facts elevate the degree of intrusion.

Finally, with regard to the extent of law enforcement needs, I return again to the fact that Hardin had already been detained. It would have been a minor inconvenience for the police to obtain a separate warrant for the vehicle. In fact, prior opinions of this Court instruct that it would have

been "best practice" for the police to take the additional step of obtaining a warrant. Our opinion in *Brown*, for example, explained, "Judicial approval makes it much more likely that the police are doing everything possible to make certain that the search is appropriate." 653 N.E.2d at 80. Stated differently, seeking and securing a warrant based on probable cause increases the odds police conduct will be viewed as reasonable. Indeed, the "preference for warrants is based on the belief that a neutral and detached magistrate is more likely to be a fair evaluator of the relevant circumstances than the police officer actively involved in investigating a particular crime." *Id.*; *see also Lacey v. State*, 946 N.E.2d 548, 553 (Ind. 2011) (finding constitutional uncertainty is minimized when police obtain express judicial authorization).

Beginning from this proposition—that it is best practice for officers to obtain a warrant—and ending with the facts that Hardin was no longer a flight risk and the vehicle was not going anywhere, I would find that the extent of law enforcement needs in this situation was extremely low. Though combatting the use and sale of drugs in our communities is certainly of utmost importance, I cannot agree that, on these facts, this factor weighs at all in the State's favor.

On balance, I believe the search was unreasonable under Article 1, Section 11 of the Indiana Constitution because, although the degree of concern or suspicion was relatively high, both the level of intrusion and needs of law enforcement weigh heavily against the State. I would suppress the evidence obtained from Hardin's vehicle and remand this matter for a new trial.

Rush, C.J., joins.